1  Michael T. Hornak (SBN 81936)
   email:  mhornak@rutan.com
2  Ronald P. Oines (SBN 145016)
   email:  roines@rutan.com
3  Bradley A. Chapin (SBN 232885)
   email: bchapin@rutan.com
4  Benjamin C. Deming (SBN 233687)
   email: bdeming@rutan.com
5  Ravi Mohan (SBN 280673)
   email: rmohan@rutan.com
6
   RUTAN & TUCKER, LLP
7  611 Anton Boulevard, Suite 1400
   Costa Mesa, California 92626-1931
8  Phone:  714-641-5100
   Fax: 714-546-9035
9

**Attorneys for Defendants SARGENT**
**MANUFACTURING COMPANY and ASSA ABLOY, INC.**

Additional Counsel listed on signature page.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| O.S. SECURITY LLC,<br><br>       Plaintiff,<br>vs.<br>SARGENT MANUFACTURING<br>COMPANY, ASSA ABLOY, INC.,<br><br>       Defendants. | Case No. SACV14-00318 AG (DFMx)<br><br>**DEFENDANTS' JOINT CLAIM**<br>**CONSTRUCTION BRIEF** |
| O.S. SECURITY LLC,<br><br>       Plaintiff,<br>vs.<br>BRK BRANDS, INC.<br><br>       Defendant. | Case No. SACV14-00310 AG (DFMx) |

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |

O.S. SECURITY LLC,

       Plaintiff,

vs.

JOHN D. BRUSH & CO., Inc., d/b/a
SENTRY GROUP

       Defendant.

Case No. SACV14-00314 AG (DFMx)

O.S. SECURITY LLC,

       Plaintiff,

vs.

SCHLAGE LOCK COMPANY, LLC,

       Defendant.

Case No. SACV14-00319 AG (DFMx)

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................... i

II.     STATEMENT OF LAW ................................................................ 1

III.    "COMMUNICATION PORT" .................................................... 2

IV.     "CONTROL STATION" ............................................................. 5

V.      "DEDICATED"............................................................................ 7

VI.     "ELECTROMAGNETIC SIGNAL" ........................................... 8

VII.    "ENABLED" / "DISABLED" AND "ACTIVATED" /
        "DEACTIVATED" ....................................................................... 9

VIII.   "INPUT CODE" / "INPUT ACCESS CODE" / "INPUT
        KEY CODE" ............................................................................... 12

IX.     "LOW BATTERY DETECTION CIRCUIT" ............................ 16

        A.    BRK Brands and Schlage .................................................. 16

        B.    Sentry.................................................................................. 18

X.      "MEANS FOR SENSING AN INPUT SIGNAL" ...................... 19

XI.     "MICROPROCESSOR IS PROGRAMMED TO ENTER
        A CODE PROGRAMMING SEQUENCE IN
        RESPONSE TO A PRESSING OF THE PROGRAM
        KEY" / "CODE PROGRAMMING OPERATION" ........................ 21

XII.    "PORTION" ............................................................................... 23

XIII.   "PROGRAM KEY" .................................................................... 24

XIV.    "SLEEP MODE" / "OPERATION MODE".................................. 26

XV.     "SOLENOID COUPLED TO THE LOCK FOR
        OPENING AND CLOSING THE LOCK" .......................................... 27

XVI.    "WHEREIN A MEMORY CONTAINS A LIMIT
        VALUE" / "LIMIT VALUE" ............................................................. 32

XVII.   "WAKE-UP SIGNAL" ................................................................ 29

XVIII.  CONCLUSION .......................................................................... 33

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, No. SA CV 02-1040-JW (MLGx), 2004 U.S. Dist. LEXIS 13415 (C.D. Cal. July 12, 2004) ...............................................................................28

*Aventis Phrams., Inc. v. Amino Chems. Ltd.*, 175 F.3d 1363 (Fed. Cir. 2013) .......................................................................................28

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249 (2010).......................................................................................28

*Bell Atl. NetworkServs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) ...............................................................2

*Bennett Marine, Inc. v. Lenco Marine, Inc.*, 549 Fed.Appx. 947 (Fed. Cir. 2013) ............................................................................ 19, 20

*Biomedino, LLC v. Waters Tech. Corp.*, 490 F.3d 946 (Fed. Cir. 2007)................20

*Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371 (Fed.Cir.2009) ........... 19, 20

*Honeywell International, Inc. v. Universal Avionics Systems Corp.*, 493 F.3d 1358 (Fed. Cir. 2007) .......................................................1

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376 (Fed. Cir. 2013).......................................................................................19

*Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420 (Fed. Cir. 1997)............................2

*Kopykake Enterprises, Inc. v. Lucks Co.*, 264 F.3d 1377 (Fed. Cir. 2001) ..........................................................................................1

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384 (1996)................................................................................1

*Mettler–Toledo, Inc. v. B–Tek Scales, LLC*, 671 F.3d 1291 (Fed.Cir.2012)......................................................................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. --, 134 S.Ct. 2120 (2014)............................................................................ 13, 24

*Nazomi Communications, Inc. v. Nokia Corp.*, No. C–10–04686 RMW, 2013 WL 2951039 (N.D. Cal. June 14, 2013), *aff'd* -- Fed. Appx. --, 2014 WL 6678247 (Fed. Cir. Nov. 26, 2014) ............... 13, 16

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)..............................................................................28

**Page(s)**

*Patent Category Corp. v. Target Corp. & Franklin Sports, Inc.*, 567 F.Supp. 2d 1171 (C.D. Cal. 2008) ...................................................................28

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................................. passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) ............................................................................................................2

*Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929 (Fed. Cir. 2013) .................................................................................................. 3, 9, 18

*Serio-US Industries, Inc. v. Plastic Recovery Technologies Corp.*, 459 F.3d 1311 (Fed. Cir. 2006) .............................................................................2

*Tuna Processors, Inc. v. Hawaii Inten. Seafood, Inc.*, 327 Fed.Appx 204 (Fed. Cir. 2009) ......................................................................................15

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) ......................................................................................................3

*Vitronics Corp. v. Conceptronic*, 90 F.3d 1576 (Fed. Cir. 1996) ...........................22

DEFENDANTS' JOINT CLAIM
CONSTRUCTION BRIEF

# I.   INTRODUCTION

O.S. Security has asserted nine patents and over 30 claims in different combinations against the defendants in these cases.  The first application for the asserted patents was originally filed more than 20 years ago by a company named Micro Enhanced Technology; the patents were only recently assigned to Plaintiff O.S. Security.  Each patent relates generally to an "electronic access control device" – essentially an electric lock that can be operated via a keypad or a remote control unit.

The parties present fifteen claim terms from the nine asserted patents in accordance with the Court's Order.  Other disputed terms are set forth in the parties' Joint Claim Construction Statement.  Each claim term is relevant to a claim or defense presented by the parties.  In many cases, adopting one of Defendants' proposed construction will mean that asserted claims containing that term are not infringed by one or more Defendants, or that those claims are invalid.

# II.   STATEMENT OF LAW

Claim construction is a question of law for the Court to decide.  *Markman v. Westview Instruments, Inc*., 517 U.S. 370, 390, 116 S. Ct. 1384 (1996).

To construe a claim, the Court should consider the claim language, the specification of the patent and the prosecution history.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  The Court should interpret the words as one of skill in the art at the time of invention would have understood them. *Kopykake Enterprises, Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001).

Claim construction begins with an examination of the words of the claim, but the claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.  When a patentee defines a claim term, explicitly or implicitly, the patentee's definition governs, even if it is contrary to the conventional meaning of the term. *See, e.g., Honeywell International, Inc. v. Universal Avionics Systems Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).  The patentee may define a

1  claim term in a particular manner even "'without an explicit statement of
2  redefinition.'" *Id.* at 1362; quoting *Bell Atl. NetworkServs., Inc. v. Covad Commc'ns*
3  *Group, Inc*., 262 F.3d 1258, 1268 (Fed. Cir. 2001).

4       In addition to the specification, "the prosecution history can often inform the
5  meaning of the claim language by demonstrating how the inventor understood the
6  invention and whether the inventor limited the invention in the course of prosecution,
7  making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at
8  1317.

9       A court may also consider extrinsic evidence such as expert testimony,
10 dictionaries, or treatises to resolve the scope and meaning of a claim term. *Kegel Co.*
11 *v. AMF Bowling, Inc.*, 127 F.3d 1420, 1426 (Fed. Cir. 1997). Extrinsic evidence may
12 be employed to ensure that the claim construction is consistent with how a person
13 skilled in the art would understand a claim term. *Pitney Bowes, Inc. v. Hewlett-*
14 *Packard Co.*, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999). Trial courts may rely upon
15 expert testimony to interpret claim language, provided it is not at odds with the
16 intrinsic evidence. *See, e.g., Serio-US Industries, Inc. v. Plastic Recovery*
17 *Technologies Corp.*, 459 F.3d 1311, 1319 (Fed. Cir. 2006).

18 **III.   "COMMUNICATION PORT"**

| **Affected Claims**: '576 Patent, Claim 11; '100 Patent, Claims 10, 91; '615 Patent, Claims 18, 19; '758 Patent, Claims 17, 18; '405 Patent, Claims 1, 12 | |
|---|---|
| **Sargent ('576 and '100 patent)**:  Hardware connection point that is part of a direct physical (as opposed to partially wireless) communication path between electronics housed inside the electronic access control device and an electronic systems outside of and distinct from the electronic access control device.<br><br>**Sargent ('615 and '405 patents)**:  Hardware connection point that is part of a direct physical (as opposed to wireless) communication path to electronics housed inside the electronic access control device. | **Plaintiff:** An input and/or output where data is transmitted |

| | |
|---|---|
| **Schlage**:  a hardware socket to permit external programming of the non-volatile memory.<br><br>**Sentry**:  An input/output (I/O) hardware interface for the bidirectional transfer of data, to permit external programming of the memory. | |

The term "communication port" appears in seven asserted claims in five asserted different patents.  Defendants propose different constructions of the term, but all Defendants agree on three essential points.  First, all Defendants agree that the communication port is a piece of hardware – a physical receptacle.  Second, all Defendants agree that the communication port must provide a direct *physical* connection to the electronic access control device; it is not a virtual or wireless connection.  Third, the communication port must permit direct communication of data to the memory of the device so that it can be programmed.

All asserted claims refer to the communication port as a physical hardware connection to a control circuit.  *See, e.g.,* '576 Patent at 20:13-14 (Claim 11: "a communication port connected to microprocessor based control circuit"); '615 Patent at 20:54-55 (claim 18: "at least two communication ports operatively coupled to the control circuit"); '405 Patent at 20:23-24 (claim 1:  "the first processor receiving the input code from the communication port").  This use in the claims is consistent with the patents' definition of "[t]he present invention" of the asserted patents.[1]

"When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).

The specification defines the "present invention" as having "a communication port **connected to** selected pins of the microprocessor IC for accessing the non-

---

[1] The specifications of the '576 and '405 patents are representative of the specifications of the asserted patents containing the term "communication port."

-3-

1    volatile memory for storing an access code." '576 Patent at 3:39-49; '405 Patent at

2    4:4-13 (*emphasis added*). The specification explains that the purpose of having a

3    physical communication port is so that an operator can program the lock after it has

4    been assembled. *Id.* According to the patents, prior art locks (which lacked

5    communication ports) had to be programmed during assembly, which was costly and

6    time consuming. *Id.*

7       The patents' specification also depicts the circuitry that physically connects the

8    "communication port" (a socket) to the memory of the access device. The depiction

9    appears in FIG. 3 of the patents, (detail

10   view reproduced at right). FIG. 3 shows

11   three electrical lines running from the

12   communication port (**item 15**) to the

13   microprocessor (**item 14**). *See* '576

14   Patent at 7:21-28; '100 Patent at 7:26-33

15   (discussing "installing a communication

16   port, namely the access code I/O **15** in

17   the microprocessor based control



FIG. 3

18   circuit."). The communication port is depicted as separate from the keypad, and a

19   way to plug into the memory of the access control device from an external source.

20   Sargent's expert, Dr. Heppe, explains the schematic of FIG. 3 and the physical

21   communication port in further detail in his declaration, and offers an opinion on

22   "communication port" that is consistent with Defendants' proposed construction. *See*

23   Heppe Decl. at ¶66.

24       The prosecution history of the asserted patents confirms that the

25   "communication port" must be a physical structure that permits direct access to the

26   memory of the device to program it. In order to overcome a prior art-based rejection

27   during prosecution of the '100 Patent application, the patentee defined the term

28

"communication port" as a "direct physical connection" and excluded wireless communications.  For example:

> "Applicants intends [sic] to point out that the *communicaiton (sic) port is a direct **physical connection** different from the wireless connection of Henderson*. Applicants intend to point out that the permanent code cannot be reprogrammed via the keypad."

A001304 (*emphasis added*).[2]

Defendants' proposed constructions all accord on these central points from the intrinsic record of the asserted patents.  The Court should confirm that a communication port must be:  (1) A hardware – not wireless – connection point (a socket); (2) that communicates programming data to the memory; (3) from an external electronics system.

Finally, Sentry's construction notes that the "communication port" is configured for the bidirectional (two-way) transfer of data to and from the memory.  The specification first introduces the term "communication port" as being an access code **I/O (input/output)** that allows the manufacturer to access the memory by interacting with the microprocessor via the communication port.  *See* '405 Patent at 9:32-36.   The specification further describes the communication port as being "bidirectional" in that it is able to input data to write the access code to memory and output data to read or verify the access code.  *See* '405 Patent, 9:14-3, 4:7-10, 10:10-21.

## IV.   "CONTROL STATION"

| **Affected Claims**: '082 Patent, Claim 21 | |
|---|---|
| **Sargent**: an active control device adapted to generate and transmit a coded signal<br><br>**Schlage**: Compromises the position set forth in the Joint Claim Construction Statement by accepting Sargent's construction. | **Plaintiff** is barred from offering a construction of this claim limitation under the Court's Order. |

---

[2]   The number "A####" refers to pages in the Joint Appendix to be filed with the reply brief.  The Joint Appendix contains the file histories for the asserted patents.

| An "active control device" is a device that is activated by an operator (e.g. by pushing a button). | |
|---|---|

Claim 21 of the '082 Patent is directed to an electronic access control system comprising two distinct devices: "a **control station** for transmitting an electromagnetic signal containing an access code" and "a **remote station**, which is powered by a battery and not physically connected to said control station." '082 Patent at 10:60-64 (claim 21, *emphasis added*). Thus, from the claim language alone, we know that any construction of "control station" must include two critical requirements. First, there must be a control station that transmits an electromagnetic signal containing an access code at the option of a user. Second, the remote station must not be physically connected to the control station; later in the claim it is described as sensing the signal sent by the operator's control station. *See id.* at 10:65-67.

The patents' specification confirms that the "control station" must be separate from the remote station and activated by an operator. The specification "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1312 (citations omitted). All of the supporting references in the specification describe the control station as a device that the user activates to transmit a signal to a different device. The "control station" is depicted in FIG. 6. FIG. 6 describes the "central control station" as a hand-held remote control unit, 59, with a button, 58, that a user presses to activate an RF transmitter. *See* '082 Patent at 7:27-44; 8:19-46.



FIG. 6

1   The '082 Patent explains that the "central control station" transmits an access
2   code wirelessly when the user presses its button. '082 Patent at 7:35-39. The code is
3   depicted as a binary code ("10011") that is transmitted to a different device (in
4   asserted Claim 21, the 'remote station'). The specification further states that this
5   binary code can be transmitted using RF, infrared, or optical signal. '082 Patent,
6   7:34-44; *see also* '082 Patent at 8:32-40 (pressing transmit button transmits a digital
7   bitstream); *accord* Heppe Decl. at ¶22-23.

8   The only "control station" described in the asserted patents is one that a user
9   activates – e.g., by pushing a button. *Id*. Plaintiff acknowledged this construction of
10  "control station" during prosecution of the '082 Patent. The patent examiner initially
11  rejected claims of the '082 Patent, finding that the transmitter described in the prior
12  art Hirano patent (1) transmits an electromagnetic signal and (2) is not physically
13  connected to the remote station. A000139-140. The patentee did not dispute the
14  examiner's characterization of the control station, but attempted to distinguish the
15  claimed invention on other grounds. A000151-152. The court should adopt the '082
16  Patent's definition of this claim term.

17  **V.   "DEDICATED"**

18  

| **Affected Claims**: '615 Patent, Claims 18, 19 | |
|---|---|
| **Sargent**: designated exclusively for a specific use or function<br><br>**Schlage**: used solely to | **Plaintiff** is barred from offering a construction of this claim limitation under the Court's Order. |

22  
23  Independent Claims 18 and 19 of the '615 Patent each require a "port" that is
24  "dedicated" to performing certain functions. Claim 18 reads, in relevant part: "the
25  second port dedicated to reading an access code from the non-volatile memory,"
26  while the second port recited in Claim 19 is "dedicated to *writing and* reading an
27  access code." (Emphasis added.)

28

Although the term does not appear anywhere else in the '615 Patent, the meaning is clear from context in the claims and from normal usage of the word in the industry.  In both Claims 18 and 19, there are "at least two communication ports." The first port is described in each claim as receiving an input code, but might also perform other functions.  The second, "dedicated" port, however, does one and only one particular thing:  In Claim 18 it only reads an access code; in Claim 19, it must both read and write an access code.

The common usage of the term "dedicated" in the electronics industry at the time of invention accords with the term's use in the claims and Defendants' proposed construction:  "Dedicated" simply means "designated for a specific use or function. For example, a communications circuit for use exclusively by specified users or for a particular function, such as data communication."  Exh. 1 (Wiley Electrical and Electronics Engineering Dictionary).  Sargent's expert, Dr. Heppe, agrees that this is how a person of ordinary skill in the art would interpret the term "dedicated" in the asserted claims.  Heppe Decl. at ¶¶85-87.

Accordingly, a person of ordinary skill in the art at the time of the invention would understand that the "dedicated" port of the '615 Patent claims is one that is "designated exclusively for" or "used solely to" perform the recited use or function.

## VI.   "ELECTROMAGNETIC SIGNAL"

| **Affected Claims**: '082 Patent, Claims 21, 22, 27; '725 Patent, Claims 1, 7; '758 Patent, Claims 14, 72 | |
|---|---|
| **Schlage:**  A radio frequency signal at 320 MHz, an optical signal, or an infrared signal.[3] | **Plaintiff** is barred from offering a construction of this claim limitation under the Court's Order. |

The asserted claims of the '082, '725 and '758 Patents require the transmission of an "input code" via an "electromagnetic signal" – *i.e.*, wirelessly –in order to open

---

[3]   Sargent asserts that the signal must be a radio frequency signal at 320 MHz and discussed this requirement in connection with the "input code" claim term.  *See* Jt. Cl. Const. Stmt., and  Heppe Decl. at ¶¶34-36, 48-50.

a lock mechanism.   The term "input code" is used inconsistently throughout the asserted patents and cannot be construed with reasonable certainty, and, as discussed below, is "indefinite" and the claims that contain the term are invalid.  *See infra* at Section VIII.  The asserted patents, however, are crystal clear regarding the proper definition of the "electromagnetic signal": it is "a radio frequency signal at 320 MHz, an optical signal, or an infrared signal."

The specifications of the '082, '725 and '758 patents describe a lock that senses data "using an electromagnetic signal input from the radio frequency (RF), optical frequency or infrared frequency bands."  '082 Patent at 7:27-31.  The patents further specify that "**[i]n the present invention**," the RF signal's "frequency is set for **320 MHz**." *Id.* at 8:21-22 (*emphasis added*).  This description of the "present invention as a whole[] limits the scope of the invention." *Regents of Univ. of Minn.* 717 F.3d at 936 (citation omitted).  In fact, the *only* circuitry described in the patent as being capable of sensing any type of electromagnetic signal is item 62 in Figure 7, which receives an RF signal at 320 MHz.  *See id.* at 7:40-8:31 & Fig. 7(62); *see also* Heppe Decl. at ¶¶47-48, describing item 62 as the structure that accepts RF signals.

Defendants' proposed construction of "electromagnetic signal" is the only construction supported by the patent specifications and the only construction consistent with the "present invention" of the asserted claims.

## VII.   "ENABLED"/"DISABLED" AND "ACTIVATED"/"DEACTIVATED"

| **Affected Claims**: '082 Patent, Claim 21; '758 Patent, Claims 14, 17, 18 and 72; '576 Patent, Claims 7, 8, 15; '100 Patent, Claims 1, 7, 30, 88, 89; '907 Patent, Claims 11, 15, 46; '405 Patent, Claims 1, 12; '615 Patent, Claim 2 | |
|---|---|
| **BRK Brands, Sentry and Sargent:**  (enabled / activated) turned on and consuming electrical power // (disabled / deactivated) turned off and consuming no electrical power<br><br>**Schlage:**  (enabled / activated) current is flowing | **Plaintiff** is barred from offering a construction of this claim limitation under the Court's Order. |

| through the circuit // (<u>disabled</u> / <u>deactivated</u>) no current is flowing through the circuit | |
|---|---|

The claim terms "enabled"/"activated" and "disabled"/"deactivated" are two sides of the same coin and should be construed together. These terms are generally used in asserted claims to describe turning on or off the low battery detection circuit or other devices. *See, e.g.*, '576 Patent at 19:41-42 (claim 7: "activate the lock actuator") & 19:49-50 (claim 8: "a low-battery detection circuit that is *enabled* by the microprocessor in the operation mode … and *disabled* when the microprocessor is in the sleep mode." (emphasis added)).

The patentees explained in the specifications of the asserted patents that these terms indicate when any particular circuit or device is turned on or off – *i.e.*, consuming electrical power (or not). For example, the patentees stated that the "electronic access control device employs a low-battery detection circuit that is **turned off and therefore consumes no electrical power** when the microprocessor is in sleep mode." '576 Patent at 4:27-30; '100 Patent at 4:32-35; '615 Patent at 4:32-35 (emphasis added). The patentees further explained that "the microprocessor-based control circuit further includes a low-battery detection circuit that **does not consume electrical power except when a low-battery detection is in progress.** *See* '100 Patent at 12:37-40; '576 Patent at 12:33-36; '615 Patent at 12:39-42.

A side by side example comparing the specification and claims demonstrates that the patentees used enable/activated (and disabled/deactivated) in their ordinary senses – supplying (or not supplying) electrical power to a circuit:

| 576 Claim 8 | 576 Specification |
|---|---|
| "low-battery detection circuit that is *enabled* by the microprocessor in the operation mode" | "low-battery detection circuit that **does not consume electrical power except when a low-battery detection is in progress**" |
| "low-battery detection circuit that is…*disabled* when the | "low-battery detection circuit that is **turned off and therefore consumes** |

| 576 Claim 8 | 576 Specification |
|---|---|
| microprocessor is in the sleep mode" | ***no electrical power*** when the microprocessor is in sleep mode" |

Thus, when the low-battery detection circuit is enabled – *i.e.*, a low-battery detection is in progress – the low-battery detection circuit is turned on and is consuming electrical power.  Conversely, when the low-battery detection circuit is "disabled" – *i.e.*, it is not checking the battery status – the circuit is turned off and is consuming no electrical power.

The patentees' statements during the reexamination of a related patent also supports Defendants' proposed constructions.  During the reexamination of U.S. Patent No. 6,359,547 ("the '547 Patent"), the inventors responded to the Order granting the Request for Reexamination by arguing that the cited prior art did not provide a low battery detection circuit that could be turned "on and off."  A003977-78. The patentee argued that, unlike their claimed invention, the prior art devices were always drawing some level of current.[4]

> "In particular, the Davis [prior art] reference includes low-battery detect circuits 50, 10, and both circuits shown in Figure 2 [of Davis] are biased to operate ***all of the time***.
>
>        \*       \*       \*
>
> "The circuit in the '547 patent clearly shows resistors R8 and R9 are connected in series to Q6 and do not connect directly to ground.  This is because transistor Q6 [in the claimed access device] is ***selectively enabled and disabled***, thus selectively enabling and disabling the low battery detection circuit.  The Davis reference discloses no such switch or transistor in series with R2, R3 and R4, thus the low battery detect circuit [in Davis] is biased and has current draw from the battery 100% of the time.
>
>        \*       \*       \*
>
> "Contrary to the express requirements of claim 4 [of the '547 patent], the Davis reference's low-battery detection circuit is not configured to selectively turn the first transistor of the low-battery detection circuit

---

[4] The '547 patent was a continuation-in-part of the asserted '082 Patent, and was the parent application for asserted '576 Patent.  Thus, the specifications of the '547 Patent and the '576 Patent (where the claim terms appear) are the same.

*on and off*.  As a result, the Davis reference fails to disclose the express elements and limitations of the claims, and therefore cannot support any finding of obviousness."

A003978 (*emphases added*).

The USPTO thereafter affirmed the validity of the '547 Patent claims, including Claim 4, without amendment.  A004048-51.  Having successfully distinguished the claimed access control device from a prior art reference in which the low battery detection circuit drew power "all of the time," the patent owner is estopped from making a contrary argument in this forum.  The terms "enabled"/"activated" means "turned on and consuming electrical power" (*i.e.*, current is flowing).  The related terms "disabled"/"deactivated" mean "turned off and consuming no electrical power" (no current is flowing).  The Court should adopt Defendants' proposed construction of these terms.

## VIII.  "INPUT CODE" / "INPUT ACCESS CODE" / "INPUT KEY CODE"

| **Affected Claims**: '082 Patent, Claim 21; '576 Patent, Claims 7, 10, 11, 15; '615 Patent, Claims 1, 4, 9, 18-19; '100 Patent, Claims 88, 90, 91; '725 Patent, Claims 1, 7; '758 Patent, Claims 14, 17, 18, 21, 22, 31, 72; '405 Patent, Claim 1 | |
| --- | --- |
| **Defendants:** The term is indefinite[5] | **Plaintiff:** A code (*e.g.*, a series of keys and/or an electronic key) for accessing a secure area |

The asserted patents and claims use the term "input code," "input access code," and "input key code" indiscriminately and without any consistency or clarity.  In one instance, the claims require an "input code" to be a part of an "electromagnetic signal" ('100 Patent, Claim 7, e.g.); at another time, the "input code" is a press on a physical keypad ('576 Patent, Claim 15, e.g.); yet another time finds the "input code"

---

[5] Sargent proposes that, to the extent any construction is possible, it must include wherein the "input code" comprises a radiofrequency (RF) "electromagnetic signal" at 320 MHz.  This argument is incorporated in the proposed construction of "electromagnetic signal."  *See supra* at Section VI.

as a communication within the device's circuitry that no user would ever know or use ('615 Patent, Claims 18, 19, e.g.).  Sometimes the "input code" is used to unlock a lock ('405 Patent, Claim 1, e.g.) and sometimes it is not ('100 Patent, Claim 88, e.g.). Moreover, although this discussion primarily discusses the "input code" element, as noted below the same ambiguity also infects the "input access code" and "input key code" limitations.  A person of skill in the art could not determine the scope of "input code," "input access code," and "input key code" with reasonable certainty.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. --, 134 S.Ct. 2120, 2124 (2014). "It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims"; rather, the claims must "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S.Ct. at 2129-30.

Attempts to construe "input code" with "reasonable certainty" founder on two basic principles of patent law.  First, any construction of "input code" must be consistent with the use of the term in the patent specification.  *Phillip*, 415 F.3d at 1312 (the specification "is the single best guide to the meaning of a disputed term") (citations omitted).  Second, "[w]here patents-in-suit share the same disclosures, common terms are construed consistently across all claims in both patents."  *Nazomi Communications, Inc. v. Nokia Corp.*, No. C–10–04686 RMW, 2013 WL 2951039, *4 (N.D. Cal. June 14, 2013), *aff'd*, -- Fed. Appx. --, 2014 WL 6678247 (Fed. Cir. Nov. 26, 2014) (citation omitted).  There is no plausible construction of "input code" that is consistent with both (1) its use in the specification and (2) across all of the claims of these related patents.

Outside the claims, the term "input code" is used only once in the asserted patents,[6] and there it is in the context of a "bitstream signal" received by the "RF

---

6   Although the citations here are taken from the '100 Patent, the same passage

decode circuitry" in the access control device and thereafter relayed to the microprocessor. '100 Patent at 11:67-12:9. Having received this bitstream signal "the microprocessor **14**, within the processing electronics, compares **the input code** with the access code in the comparator." '100 Patent at 12:4-5 (emphasis added). The "access code" is described as a code that is programmed into the device and later used to open and close the lock. *See, e.g.*, '100 Patent at 7:15-8:57 (describing programming the "access code") and 10:16-24 (describing entering the "access code" via a keypad or RF signal to open the lock).

Thus, in the specification the "input code" is part of a bitstream signal from an outside RF signal, separate and distinct from the access code used to operate the access control device. Moreover, aside from this single, brief passage, there is no other use of "input code" in the patents. There is no description of where "the input code" came from, why it is relevant to the "bitstream signal" from the "RF decode circuitry," or why the "input code" is being compared to the "access code" used to unlock the device.

The asserted claims, however, use the term "input code" in a completely different way. In contrast to the single passage in the patent specification, the asserted claims generally (but not exclusively) require that the "input code" be used to open the claimed locks. Asserted Claim 15 of the '576 Patent is one example:

"15. A method comprising the steps of: storing an access code within a non-volatile memory;

providing a wake-up signal in response to pressing a first key on a keypad used to enter **an input code** comprising the first key and at least one subsequent keypad entry;

waking-up a microprocessor for a period of time in response to the wake-up signal;

transmitting **an input code** to the microprocessor;

comparing **the input code** with the access code during the period of time;

activating a lock actuator if **the input access code** matches the access code;

entering a sleep mode after the period of time, wherein during the

appears in each of the Asserted Patents.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

sleep mode the microprocessor operates at a lower power consumption rate than when the microprocessor is awake."

'576 Patent at 20:34-50 (*emphasis added*).

In Claim 15, "an input code" is described as something the user enters into the device via a keypad – and **not** as something generated as part of a "bitstream signal" received via RF decode circuitry, as "input code" is described in the specification. Moreover, Claim 15 references at least two different "input codes":  "**an input code** comprising the first key and at least one subsequent keypad entry" and "**an input code** [transmitted] to the microprocessor."  *See Tuna Processors, Inc. v. Hawaii Inten. Seafood, Inc.*, 327 Fed.Appx 204, 210 (Fed. Cir. 2009) (each use of the indefinite article ("a") prior to the term "input code" signals the introduction of a new claim element.) (citing, *inter alia*, MPEP 2173(e)).  One of these two "input codes" – the claim doesn't say which – is then compared to the "access code."  The lock is then unlocked if something called "*the* input access code" (a term nowhere defined) "matches the access code."  None of these usages are consistent with the (very limited) description of the "input code" in the specification.

Moreover, the varying uses of "input code" in Claim 15 of the '576 Patent are not consistent with the use of the same term in the other asserted claims of the asserted patents.  For example, in Claim 72 of the '758 Patent, the "input code" is an internal code that is created by the "third circuit" in response to an "electromagnetic signal"; in contrast to Claim 15, it is not a code that is entered on a keypad or received from any outside source.  '758 Patent at 24:34-37.  Asserted Claim 19 of the '615 Patent receives an "input code" via a "communication port," not a keypad.  '615 Patent at 20:65-67.  Asserted Claim 7 of the '576 Patent dispenses with "input codes" entirely, and recites instead that the user enters an "input access code" on a keypad.  '576 Patent at 19:30-35.  And asserted Claim 88 of the '100 Patent uses "input code" in yet another, different way:  the "input code" merely "awaken[s]" the processor from "sleep mode," but, unlike other asserted claims, the "input code" is **not** used to

1   unlock any lock. '100 Patent at 20:3-4. Rather, Claim 88 of the '100 requires the

2   user to subsequently enter "an input key code" – a new, different code – in order to

3   unlock the lock. '100 Patent at 20:10-14.

4       The Court's task is to construe "input code" in a manner that accords with its

5   description in the specification and its use across all of the claims of the asserted

6   patents, **with clarity**. *Phillips*, 415 F.3d at 1312; *Nazomi*, 2013 WL 2951039, at *4.

7   There is no construction of "input code" that can be used across all asserted claims of

8   the patents and none of the asserted claims' divergent uses of "input code" are

9   consistent with the sole, limited description of an "input code" in the specifications of

10  the asserted patents. The scope of the term "input code" cannot be determined with

11  reasonable certainty. It is indefinite.

12  ## IX.   "LOW BATTERY DETECTION CIRCUIT"

13
14  | **Affected Claims**: '576 Patent, Claim 8; '615 Patent, Claim 2; '100 Patent, Claims 30, 89; '758 Patent, Claims 14, 72; 405 Patent, Claim 1 | |
| --- | --- |
| **BRK Brands and Schlage**: a circuit that generates a reference voltage when turned on, and compares the reference voltage to the voltage of the battery **Sentry**: a circuit including a voltage divider and a first transistor to compare a voltage of a battery and a reference voltage, and a second transistor disposed in series with the voltage divider to selectively turn the current through the voltage divider on and off | **Plaintiff:** a circuit that determines whether measured battery voltage is below a certain level |

21  ### A.   BRK Brands and Schlage

22      The constructions proposed by all Defendants are true to the intrinsic

23  evidence.[7] BRK Brands and Schlage propose that the Court construe "low battery

24  detection circuit" as "a circuit that generates a reference voltage when turned on, and

25  compares the reference voltage to the voltage of the battery."

26
27
28  [7] Sentry has proposed a narrower construction of "low battery detection circuit,"
which is also consistent with the intrinsic record. See discussion *infra*.

1   The low battery detection circuit is used to determine when a user should

2   change the battery in the locking device.  The patentees described the low battery

3   detection circuit as generating a "reference voltage" and comparing it with the

4   battery's voltage, so that the user knows to change the battery:

5   > "Normally pin 6 of the microprocessor [as shown in Figure 8] would
    > stay low, and both the transistor 76 and the transistor 80 would be

6   > turned off.  ***When a battery voltage test is performed***, pin 6 is

7   > switched to the high ("1") state to turn on the transistor 76, and the
    > state of pin 15 is sensed by the microprocessor 81 to determine the

8   > on/off state of the transistor 80.  If the battery voltage is sufficiently

9   > high, the output of the voltage divider 74 would be high enough to turn
    > the transistor 80 off.  On the other hand, if the battery voltage is low,

10  > the output of the voltage divider [74] would be low enough to turn the

11  > transistor 80 on, and pin 15 would be switched to the high state."

12  '576 Patent at 12:55-13:3; '615 Patent at 12:61-13:9; '100 Patent at 12:59-13:7

13  (emphasis added).

14   The reference voltage is a real voltage – it is not a simulation.  The low-battery

15  detection circuit creates a reference voltage by turning on a transistor (76).  *Id.*

16  Turning on the transistor allows electrical current to flow and generates the low

17  battery detection circuit's reference voltage.  *Id.*  The circuit then compares the

18  voltage of the current coming directly from the battery to the reference voltage by

19  using a "voltage divider" (74).  *Id.*  If the output of voltage divider 74 is sufficiently

20  high, the battery voltage is okay and the battery need not be replaced.  *Id.*  If,

21  however, the output of the voltage divider is low, the battery's voltage is low and the

22  battery should be replaced.  *Id.*

23   The prosecution history confirms that this definition of the claim term "low

24  battery detection circuit."  During prosecution of the '615 Patent, the patentees

25  specifically relied on this passage in the patent to overcome the Examiner's rejection

26  of the relevant claims as being unsupported.  A001067.  Indeed, the cited definition

27

28

1  of the "low-battery detection circuit" is the only description of this claim element

2  anywhere in the asserted patents.

3       Thus, a person of ordinary skill in the art would understand from both the

4  common specification and the prosecution history that the claimed "low battery

5  detection circuit" is described by this passage – *i.e.*, it is "a circuit that generates a

6  reference voltage when turned on, and compares the reference voltage to the voltage

7  of the battery."

8       **B.    Sentry**

9       Sentry agrees with BRK and Schlage's characterization of the low battery

10  detection circuit as a basis for its construction, and further adds that the patentee

11  intended to limit the "low battery detection circuit" to include the specific electrical

12  components included in Sentry's construction.

13       The patentee acknowledged it was "common to include a low-battery detection

14  circuit in an electronic lock" but explained that its patent was intended to "improve"

15  upon prior low battery detection circuits.  '100 Patent at 2:29-30, 3:20-22; '576

16  Patent at 2:25-26, 3:15-18; '615 Patent at 2:30-31, 3:20-23; '405 Patent at 2:31-32,

17  3:53-55.   The specification provides only a single embodiment describing the

18  improved low battery detection. See '405 Patent, 14:35-15:4; FIG. 8.   This single

19  embodiment is identified as the low battery detection circuit (item 68) shown in FIG.

20  8, which was characterized by the patentee as being the "present invention." '405

21  Patent, 4:52-63, 14:35-38.  This alleged invention is described in the specification as

22  including a voltage divider (item 74) and first and second transistor (items 80, 76).

23  Given that the patentee characterized the specific low battery detection circuit as the

24  "present invention," "this description limits the scope of the invention" and Plaintiff

25  is bound to the inclusion of these specific electrical components in its low battery

26  detection circuit. *Univ. of Minn.*, 717 F.3d at 936.

27       //

28       //

## X. "MEANS FOR SENSING AN INPUT SIGNAL"

| **Affected Claims**: '082 Patent, Claim 21 | |
|---|---|
| **Defendants:** This is a means-plus-function term. The function is to sense an optical, infrared and radiofrequency (RF) signal. The term is indefinite, however, because the patent discloses no structure to sense the claimed infrared or optical signal. | **Plaintiff:** Plaintiff is barred from offering a construction of this claim limitation under the Court's Order. |

The Court should find asserted Claims 21, 22 and 27 of the '082 Patent invalid because the '082 Patent fails to disclose sufficient structure to perform the claimed "means for sensing." The '082 Patent's "means for sensing" is written in means-plus-function format and is subject to 35 U.S.C. § 112(6/f). A two-step process applies to construing a means-plus-function claim: the Court (1) identifies the function of the "means for sensing" and (2) looks to the specification of the '082 Patent to identify the corresponding structure for performing that function. *Mettler–Toledo, Inc. v. B–Tek Scales, LLC,* 671 F.3d 1291, 1295–96 (Fed.Cir.2012).

Importantly, a means-plus-function claim must describe specific structures that can perform the claimed function. Id. It is not sufficient that a person of ordinary skill of art could imagine some circuit that performs the function of the '082 patent's claims; to satisfy this test, the '082 patent's specification must disclose a specific structure that performs the function of the claimed "means for sensing." *Blackboard, Inc. v. Desire2Learn Inc.,* 574 F.3d 1371, 1382–83 (Fed.Cir.2009); *Bennett Marine, Inc. v. Lenco Marine, Inc.*, 549 Fed.Appx. 947, 954 (Fed. Cir. 2013) ("corresponding structure should be limited to that specific [described] structure and its equivalents, rather than any circuit capable of performing the required function."). If the '082 patent's specification does not associate a specific structure with the claimed function, the claim limitation is indefinite and its associated claim(s) are invalid. *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

1   Identifying the function of the claim is straightforward:  the claim states that
2   the function of the means is to "sense an input signal."  Claim 21 further states that
3   the signal to be transmitted and therefore sensed by the input electronics is "an
4   electromagnetic signal."  The claims that depend from Claim 21 further describe the
5   electromagnetic signal as a "radio frequency" signal, "an optical signal" and an
6   "infrared signal."  *See* '082 Patent at 11:20-28 (dependent Claims 22, 23 and 24);
7   *accord id.* at 7:27-31.  Therefore asserted patents must describe structures that can (at
8   a minimum) sense each of the claimed "radio frequency" signal, "an optical signal,"
9   and an "infrared signal."  *Id.*

10   The '082 Patent, however, fails to disclose structures for sensing all three of
11   the claimed signals.  The '082 Patent *only* discloses a structure that can purportedly
12   sense a "radio frequency" signal set for 320 MHz, not an optical or infrared signal.
13   *See* '082 Patent at 7:40-56 & 8:1-54; Fig. 7 (circuits 61, 62).  There are no structures
14   for sensing the claimed "optical" or "infrared" signals described anywhere in the '082
15   Patent or associated in any respect with the claimed "means for sensing an input
16   signal."   Indeed, the '082 Patent acknowledges that the sole disclosed "sensing"
17   circuit is *only* applicable "[w]hen an RF signal is used"; it cannot be used with an
18   optical or infrared signal.  *Id.* at 7:40, *et seq.*  Sargent's expert, Dr. Heppe, agrees.
19   Heppe Decl. at ¶¶30-45.

20   The absence of any description in the '082 patent's specification of structures
21   capable of sensing the claimed infrared and optical signals is fatal to the asserted
22   "means for sensing."  Because no structure is disclosed that can perform the claimed
23   function, the claim term is indefinite and asserted Claims 21, 22 and 27 are invalid.
24   *See Ibormeith*, 732 F.3d at 1379; *Bennett Marine*, 549 Fed.Appx. at 954; *Biomedino,*
25   *LLC v. Waters Tech. Corp.*, 490 F.3d 946 (Fed. Cir. 2007); *Blackboard,*574 F.3d at
26   1382–83.

27
28

1
2
3

## XI. "MICROPROCESSOR IS PROGRAMMED TO ENTER A CODE PROGRAMMING SEQUENCE IN RESPONSE TO A PRESSING OF THE PROGRAM KEY" / "CODE PROGRAMMING OPERATION"

| Affected Claims: '576 Patent: Claim 10; '615 Patent: Claim 4; '100 Patent, Claims 30, 88 | |
|---|---|
| **Sargent:** The mode in which a new access code can be programmed into the non-volatile memory<br><br>**Sentry:** Programmed instructions stored in memory for execution by the microprocessor that allows an additional access code to be stored in the non-volatile memory in addition to the previously stored access code, wherein either: 1) the previously stored access code can also be used to access the electronic access control device; or 2) the previously stored access code is temporarily disabled | **Plaintiff:** A mode where a memory location is able to be modified |

The parties agree that the terms "microprocessor is programmed to enter a code programming sequence in response to a pressing of the program key" and "code programming operation" are similar and should have the same claim construction. These claim terms each refers to an operation wherein a user presses a "program key" (discussed below) in order to program an additional (new) "access code" into the device.

The claim language of the '576 and '615 patents supports Defendants' proposed construction. *Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of a particular claim"). Dependent Claim 10 of the '576 Patent and dependent Claim 4 of the '615 Patent teach that "in response to [a] pressing of the program key," the processor will receive an input code from the keypad and, if the input code matches a stored access code, the microprocessor will "receive an additional access code… and store the additional access code in the non-volatile memory." '576 Patent at 20:1-11; '615 Patent at 18:54-63. Thus, according

1   to the claim language itself, when the program key is pressed, the microprocessor

2   enters an operation wherein an "additional access code" may be created and added to

3   memory, criteria spelled out in both the Defendants' proposed constructions.

4   *Phillips*, 415 F.3d at 1314 ("the context in which a term is used in the asserted claim

5   can be highly instructive.").

6        Both Sargent's and Sentry's constructions also accord with the description of

7   the claimed "access control device" in the specifications of the asserted patents. "The

8   specification is . . . the single best guide to the meaning of a disputed term."

9   *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).   The

10  specifications of these patents as they relate to the "code programming operation" are

11  essentially identical.  In all instances, the specification discloses that pressing of the

12  "Program Key" followed by a sequence or operation of steps will result in the storage

13  of an additional access code in memory. '576 Patent at 8:15-47; '615 Patent at 20-

14  52; '100 Patent at 8:20-52 ("If the program key (PROG key) is first pressed, the

15  operator wishes to input an additional access code.").  The specifications state that

16  the "program key's" sole use is to initiate a programming operation.   The

17  specifications do not disclose that pressing of the program key is used for any

18  function other than to store an additional access code in memory.  Indeed, pressing

19  the program key any time other than the first keypad entry from sleep mode "will

20  display an error message." '576 Patent at 8:48-51.

21        The specifications, like the claims, consistently instruct that pressing the

22  program key will start a sequence or operation to enter an "additional access code."

23  If the operator enters an access code which matches a stored access code, the operator

24  receives "clearance to input an additional access code" which the microprocessor will

25  store as an "additional access code" so that either the stored access code or the

26  additional access code may be used to open the lock.  '576 Patent at 8:17-33; '615

27  Patent at 8:22-38; '100 Patent at 8:22-38.  The specifications offer one alternative

28  which is similarly reflected in Sentry's construction.  Instead of allowing multiple

access codes to open the lock, the "new access code [may] disable[] access to the permanent access code" such that the additional access code alone opens the lock. '576 Patent at 8:34-47; '615 Patent at 8:39-52; '100 Patent at 8:39-52.  Thus, the claim must be construed such that pressing the program key will always trigger a sequence or operation wherein the operator may enter an additional (new) access code.

## XII.   "PORTION"

| **Affected Claims**: '100 Patent, Claim 1; '725 Patent , Claim 1; '758 Patent, Claim 14 | |
|---|---|
| **Sargent:**  "Portion" means "a part of a larger amount"<br><br>**Schlage:**  As used in the asserted claims, "portion" is indefinite | **Plaintiff:** Plaintiff is barred from offering a construction of this claim limitation under the Court's Order. |

Although "portion" may have a perfectly clear dictionary definition, the term is indefinite as it is used in the claims of the asserted patents.  The term "portion" appears in the claims of the '100, '725 and '758 Patents in the context of activating and deactivating a part of a circuit during different time periods.  Claim 14 of the '758 Patent is exemplary.  It recites:

> "a circuit having *a portion* deactivated during a first time period;
> *a portion* of the circuit enabled during a second time period,
> *a portion* of the circuit having an enable output signal generated in response to a sensed electromagnetic signal;
> *a portion* of the circuit being enabled for an extended time period that is greater than the second time period;
> *a portion* of the circuit having an input code output generated in response to an electromagnetic signal and during the extended time period…."

'758 Patent at 19:5-26 (asserted Claim 14).

The dictionary definition of "portion" is "a part of a larger amount."  *See* http://www.merriam-webster.com/dictionary/portion; Heppe Decl. at ¶103-105. The patents, however, make no attempt to distinguish or specify how many lines and

transistors comprise "a portion" of "a circuit" and how many are required for "a circuit" as a whole.  Indeed, some asserted claims simply activate and deactivate different "circuits" in the same fashion as Claim 14 (above) activates and deactivates selected "portion[s]" of a single circuit.  *Compare, e.g.,* '758 Patent at 24:28-41 (asserted Claim 72).  Nor, as illustrated in Claim 14 of the '758 Patent, above, is there any attempt in the claims to distinguish any one "portion" of a circuit from a different "portion" of a circuit.

The specifications of the asserted patents are no help in determining the scope of the claims:  they only discuss activating and deactivating "circuits" as a whole, not "portion[s]" of circuits.[8]  *See, e.g.,* '758 Patent at 4:24-35 & 10:20-55.  In fact, as explained by Sargent's expert, Dr. Heppe, it is impossible to "draw a box" around the claimed "portion" of a circuit because the specification and claims never defines any relevant "portion" of a circuit.  Heppe Decl. at ¶¶103-105.  Thus, while it is true that a "portion" of a circuit must always reference some smaller part of a whole circuit, the application of this definition to the asserted claims renders those claims indefinite and invalid. *Nautilus*, 134 S.Ct. at 2129-30.

## XIII.  "PROGRAM KEY"

| **Affected Claims:** '100 Patent, Claims 30, 88, 89, 91; '725 Patent, Claims 2 and 8; '758 Patent, Claim 21 | |
| --- | --- |
| **Defendants:**  A dedicated button that, without any other keystroke, interrupts sleep mode and initiates a code programming operation.  Sentry's construction includes the requirement that the dedicated button is mounted on the keypad. | **Plaintiff** is barred from offering a construction of this claim limitation under the Court's Order. |

The asserted patents describe a "program key" as a specific key found on the keypad.  FIG. 1 depicts the program key on the keypad.  *See also* A002472 ("Applicants respectfully assert that, inter alia, Figure 3 clearly shows this feature with the key labeled 'PROG,' which is short for the term 'program.'").

---

[8]  In fact, the word "portion" does not appear anywhere in the specifications.



FIG. 1

FIG. 3

The written specification of the asserted patents also describes the "program key" as a specific, dedicated button that a user can press and immediately enter a code programming operation. *See, e.g.,* '100 Patent at 8:17-54. According to the patents, having a dedicated button devoted to programming simplifies the internal wiring of the system and provides a clear demarcation between programming the lock and operating it. *Id.* at 6:40-46 and 8:17-54. With a press of a single, dedicated button, the operator wakes the system from sleep mode and enters programming mode without the need for any other keystrokes.

True to the claims, the specification of the asserted patents describe the only function of the program key as programming an additional access code into memory for future use. *See* '100 Patent at 6:40-46 and 8:17-52. In order to perform this function, the asserted patents state that the program key must be the first key entered by the user: "[i]f an operator enters the PROG key at any time other than at the first keypad entry from sleep mode, the microprocessor will display the error message 47 by sounding the acoustic output 16 through pin C2 and the LED 13." '100 Patent at 8:53-56.

During the course of their arguments to the Patent Office, the inventors relied upon these features of the "program key" in order to distinguish the prior art. The inventors explained that having a program key "provides an easy and quick access [to] code programming operation that is initiated by pressing a program key on a keypad of the access control device." A000739. The inventors continued:

"In conventional electronic locks, programming a new code into the lock is often a complicated operation, requiring the user to go through several layers of menus to get to the program mode....

"In contrast [to prior art devices], the microprocessor of the access control device of the claimed invention can wake up and immediately enter a code-programming mode when the user pressed a program key on the keypad a single time, without requiring other control signals..... Thus, pressing the program key not only sends an interrupt signal to wake the microprocessor up from the sleep mode but also allows the microprocessor to determine that the program key is pressed and, in response, to enter the programming mode to allow an additional access code to be programmed into the memory."

A000739-40; *see also* A002649-50 (citing the "program key" as a basis to distinguish the prior art).

Defendants' proposed construction that the "program key" is a dedicated button on a keypad used to wake the lock from sleep mode and immediately enter a programming mode adheres to precisely to the description of the "program key" found in the patents, as well as the statements made during prosecution Plaintiff to distinguish the prior art.

## XIV. "SLEEP MODE" / "OPERATION MODE"

| **Affected Claims:** '100 Patent, Claims 30, 88, 89; '576 Patent, Claims 7, 15; '615 Patent Claims 1, 2, 4, 9 | |
|---|---|
| **Defendants:** (sleep mode) a mode in which the microprocessor is not functioning /// (operation mode) a mode in which the microprocessor is functioning | **Plaintiff:** (sleep mode) a mode where less power is consumed than in a normal operational mode /// (operation mode) a mode in which a microprocessor shifts from a lower-power consuming mode (e.g. "standby," "low power," or "sleep mode") to allow the microprocessor to activate one or more functions of the electronic access control device. |

The terms "sleep mode" and "operation mode" are linked in the claims and specifications of the asserted patents, and they should be construed together. Indeed, the intrinsic evidence makes clear that the operation mode and sleep mode provide an

"either/or" proposition for the claimed electronic access control device:  the device is either in operation mode and functioning or it is in sleep mode and is not functioning but, rather, waiting to be awakened.  The patentees clearly stated in the common specification of the '100, '576 and '615 Patents that the claimed device is "normally in a sleep mode.  In other words, the device is ***not in active operation***" – i.e., the device's microprocessor is *not functioning*.  '100 Patent at 9:64-66; '576 Patent at 9:60-62; '615 Patent at 9:64-66 (emphasis added).  The opposite of the claimed sleep mode is the operation mode and the opposite of being "not in active operation" is being "in active operation."

Defendants' construction reflects the distinction between the claimed device being "in active operation" and ***not*** being "in active operation," whereas Plaintiff's proposed construction defines the terms as actions – "a microprocessor ***shifts*** from a lower-power consuming mode" – and with vague terms that are indefinite and provide no guidance, including "***less*** power," "***normal*** operation mode," "standby" and "***low*** power."  Allowing such vague concepts as these into the claim construction would introduce ambiguity that the jury would have to solve on its own, thereby undermining the purpose of claim construction proceedings.

## XV.  "SOLENOID COUPLED TO THE LOCK FOR OPENING AND CLOSING THE LOCK"

| **Affected Claims:** '547 Patent, Claim 18 | |
|---|---|
| **Sentry:** A solenoid connected, fastened, or joined to the lock for moving the lock between a position that secures a door, gate, lid, drawer, or the like, and a position that unsecures the door, gate, lid, drawer, or the like | **Plaintiff** is barred from offering a construction of this claim limitation under the Court's Order |

Plaintiff contends that no construction is needed for this term and would seemingly entrust the jury to determine claim scope.  Defendants do not dispute that the phrase's plain and ordinary meaning must apply.  In fact, defendants cannot

1   conceive of a construction other than the one they propose which would encompass

2   the phrase's plain and ordinary meaning.  Since, however, plaintiff has not offered a

3   construction, the court must "determine what claim scope is appropriate in the

4   context of the patents-in-suit."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,

5   521 F.3d 1351, 1361 (Fed. Cir. 2008) (instructing the district court to construe the

6   phrase "only if" since there was a genuine dispute over the scope of the phrase).

7          As with many of the claim terms in the patents in suit, the specification

8   contains no written description of a "solenoid coupled to the lock for opening and

9   closing the lock" and, in fact, in the '547 Patent, the phrase is found only in

10  independent Claims 1 and 18.  Since a claim must be construed to give effect to every

11  term, defendants' proposed construction gives meaning to the term "coupled."

12  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (2010).

13  The only evidence of the meaning of the word "coupled" is found in Figure 15 which

14  schematically shows the solenoid and the lock directly and physically connected.

15         The ordinary and customary meaning of the term "coupled" supports

16  defendant's interpretation of Figure 15.  *Aventis Phrams., Inc. v. Amino Chems. Ltd.*,

17  175 F.3d 1363, 1373 (Fed. Cir. 2013).  "Coupled," in its ordinary sense, means "to

18  fasten, link, or associate together in a pair or pairs" or "to join; connect."  Exh. 2,

19  Webster's Encyclopedic Unabridged Dictionary of the English Language, Random

20  House Value Publishing Inc. (1996), pg. 463. Use of similar dictionary definitions of

21  "coupled" has been adopted by this court.  *See, e.g., Patent Category Corp. v. Target*

22  *Corp. & Franklin Sports, Inc.*, 567 F.Supp. 2d 1171, 1197 (C.D. Cal. 2008)

23  ("coupled . . . is defined as 'to link together; connect" or "'to fasten together'");

24  *Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, No. SA CV 02-1040-JW

25  (MLGx), 2004 U.S. Dist. LEXIS 13415, at *42 (C.D. Cal. July 12, 2004) (assigning

26  "coupled to" its dictionary or "plain and ordinary meaning, which is 'directly

27  connected to or attached to'").  Thus, under a plain meaning of "coupled," with

28

1  support from the '547 Patent, it follows that the solenoid must be connected,

2  fastened, or joined to the lock.

3        Defendants' construction is consistent with the intended function of the

4  solenoid which must operate a lock directly, moving the lock between a secure

5  position and an unsecure position. Each time the specification discusses the function

6  of the solenoid, the solenoid's purpose is to operate or move the lock, often

7  specifically between a locked and unlocked position. *See, e.g.,* '547 Patent at 3:8-9

8  ("solenoid-operated lock"); '547 Patent at 9:12-13 ("power to the solenoid to unlock

9  the lock (i.e., the solenoid must push the plunger in against the coil to open the

10 lock)"); '547 Patent at 9:26-27 ("to unlock the lock" . . . the device must supply

11 power to the solenoid"); '547 Patent at 14:18-20, 14:30-31 ("energiz[ing] [a] solenoid

12 to open a lock"). Similarly, a review of the prosecution history demonstrates that the

13 solenoid is intended to physically open the lock. A000367-68 ("[T]he energizing

14 circuit is controlled to supply sufficient power to energize the solenoid to open the

15 lock."); A000401 ("[T]he invention reduces power consumption by applying a higher

16 level of power to energize the solenoid to open the lock and then applying a lower

17 level of power to the solenoid to maintain the lock in the open position.").

18       Plaintiff cannot dispute that defendants' proposed construction is consistent

19 with the plain and ordinary meaning of the phrase and the description of the

20 solenoid's operation in the specification and prosecution history, and therefore, this

21 Court should construe this term and adopt defendants' proposed construction.

22 **XVI.   "WAKE-UP SIGNAL"**

| **Affected Claims:** '576 Patent, Claim 15; '100 Patent, Claim 1; '615 Patent, Claims 1, 9 | |
|---|---|
| **BRK**: An interrupt that causes the microprocessor to enter an operation mode, i.e., begin functioning<br><br>**Sentry**: An electrical impulse that causes a microprocessor to enter a mode where current is flowing therethrough. | **Plaintiff**: An indicator that enables circuitry to receive information |

| **Sargent**: A signal generated external to a microprocessor and separate from the keypad's transmission of the access code numbers, which causes the microprocessors to switch from a sleep mode to an awake mode of operation. | |
| --- | --- |
| **Schlage**: An interrupt that causes the microprocessor to begin drawing current. | |

Several of the asserted claims address the situation in which the electronic access control device is brought out of a "sleep mode" by a "wake-up signal." For example, both Claim 15 of the '576 Patent and Claim 1 of the '100 Patent recite: "providing [or generating] a wake-up signal in response to pressing a key on a keypad…" and thereby waking-up the processors in response to the wake-up signal. '576 Patent at 20:37-39; '100 Patent at 18:26-27. All Defendants agree the wake-up signal is a signal that causes the microprocessor to begin functioning before an operator enters an access code and opens the locks. *See also* Heppe Decl. at ¶¶71-72.

The language of the '576 Patent and '100 Patent claims and specification, and prosecution history all indicate that the "wake-up signal" is an external signal that must precede an attempt to open the lock.

The relevant claim language itself indicates that the wake up signal is an external signal generated in response to user input, namely pressing a key on a keypad ("providing a wake-up signal in response to pressing a first key on a keypad").

The specifications of the patents also state that pressing "a number" on the keypad is needed to generate the wake-up signal. "If **a number** from the keypad 11 is first entered while in sleep mode 48, the microprocessor 14 waits until another four numbers are entered 49, 50, 51, and 52, from the keypad 11." '576 Patent, 8:53-63; '100 Patent, 8:57-60 (emphasis added). Moreover, during prosecution, the patentees distinguished their alleged invention from the prior art Henderson reference based on

the claimed requirement that a specific key press on a keypad generate a wake-up signal.[9]

> "Accordingly, independent claims 41, 43, 54, **67**, 69, and 75, have been amended to clarify which keys on the keyboard awaken the processor.[[10]]   As previously stated above, it was agreed that Henderson would be overcome if the claims were amended such that the processor is awaked by actuation of the keys used to enter an access code.  In view of this, and to clarify that only actuation of one key is required, the Applicants have amended the claims wherein, generally stated, pressing _either_ of at least two keys on the keypad used to enter the access code will trigger a transition from sleep mode."

A000827 (*emphasis in original*).

All of these remarks clearly indicate the patentee's intent to define the "wake-up signal" as a signal that interrupts the device's "sleep mode" so that it can subsequently receive an access code.  *See also* Heppe Decl. at ¶¶79-80.  Moreover, in every instance in the patent claims and specification, the event that generates the claimed "wake up signal" is ***not*** the entry of an "access code" or an "input code," whatever that may be (as noted above, "input code" is indefinite).  Rather, the "wake up signal" is generated in response to a separate key press preceding the access code. It is only after the "wake-up signal" key press that the system is able to accept further entries (*e.g.,* an access code).  '576 Patent, 8:53-63; '100 Patent, 8:57-60 ; *see also* discussion of "Program Key," *supra*.

Accordingly, the proper interpretation of "wake-up signal" requires:  (1) the signal be generated external to the microprocessor – for example, at the keypad and (2) the signal interrupt the microprocessor's "sleep mode" so that the microprocessor

---

[9] The remarks cited here happened during prosecution of the '576 Patent application. However, the remarks made are equally applicable to the term as used in the '100 Patent, which was a continuation of the '576 Patent application.

[10] Prosecution Claim 67 later issued as Claim 15.

can accept subsequent user entries (e.g., typing in an access code number on a keypad). All Defendants agree on these two essential points.

## XVII. "WHEREIN A MEMORY CONTAINS A LIMIT VALUE" / "LIMIT VALUE"

| Affected Claims: '100 Patent, Claim 36 | |
|---|---|
| **Sentry:** Number of permitted accesses | **Plaintiff:** Wherein a memory contains a value for limiting access to a device |

These two similar phrases are not found anywhere in the specification of the '100 Patent. Rather, the '100 Patent discloses a "master key that has a number of access programmed therein" for "limiting the number of times the master key can be used to open locks." '100 Patent at 17:2-3; 17:32-33. This must be the "limit value" identified in the claims. The specification makes it clear that a user may program a "master key" so it will permit only a controlled number of accesses to the electronic access control device, making the "use of the master key . . . strictly controlled." '100 Patent at 17:42-43. In the words of the patent, the master key may be programmed with a particular "number of access allowed," or "number of access stored" to control how many times the master key is permitted to access an electronic access control device. '100 Patent at 17:2-6, 17:12-13, 17:21-23, 17:38-39. The specification further states that "[i]f the number of accesses is one or greater, then the microprocessor energizes the solenoid to open the lock." '100 Patent at 17:23-24. These portions of the specification fully support defendants' proposed construction.

Sentry's construction of this term also perfectly accords with the rest of the language in Claim 36. Claim 36 states, in part, that the processor "generates a signal to activate a lock actuator in response to the limit value." '100 Patent at 22:15-18. Thus, if the number of permitted accesses (i.e., limit value) is one or greater, the processor will respond by generating a signal to activate the lock actuator. The Court should adopt Sentry's proposed construction.

# XVIII.    CONCLUSION

Defendants respectfully submit that the patent claims and the intrinsic evidence support the claim constructions proffered herein.  Although in some instances the language proposed by each defendant may differ somewhat, the general scope of each construction is consistent across the Defendants, and comports with the claims and specification.   Furthermore, the extrinsic evidence cited also supports the Defendants' proposed constructions.  For example, Sargent has offered the testimony of Dr. Heppe, a Ph.D. holder in Electrical Engineering with more than 35 years of experience in the relevant fields, in support of the proposed constructions. Accordingly, the Defendants respectfully request that the Court construe the claim terms identified herein as proposed by the Defendants.

Dated:          February 3, 2015               RUTAN & TUCKER. LLP

By:  /s/ Ronald Oines
_____
**Attorneys for Defendants SARGENT
MANUFACTURING COMPANY
and ASSA ABLOY, INC.**

Michael T. Hornak (SBN 81936)
email:  mhornak@rutan.com
Ronald P. Oines (SBN 145016)
email:  roines@rutan.com
Bradley A. Chapin (SBN 232885)
email: bchapin@rutan.com
Benjamin C. Deming (SBN 233687)
email: bdeming@rutan.com
Ravi Mohan (SBN 280673)
email: rmohan@rutan.com
RUTAN & TUCKER, LLP
611 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-1931
Phone:  714-641-5100
Fax: 714-546-90351921

1    Dated:        February 3, 2015                    BARNES & THORNBURG LLP

2                                            By:  */s/ Jeffrey M. Baron*

3                                                 **Attorneys for Defendant SCHLAGE
                                                 LOCK COMPANY, LLC**
4

5                                                 Kevin D Rising (SBN 211663)
                                                 email: kevin.rising@btlaw.com
6                                                 Sarah E. Johnston (SBN 259504)
                                                 email: sjohnston@btlaw.com
7                                                 BARNES AND THORNBURG LLP
                                                 2029 Century Park East, Suite 300
8                                                 Los Angeles, CA 90067-3010
                                                 Phone: 310-284-3880
9                                                 Fax: 310-284-3894

10                                                Paul B. Hunt (pro hac vice)
                                                 email: paul.hunt@btlaw.com
11                                                Jeffrey M Barron (pro hac vice)
                                                 email: jeff.barron@btlaw.com
12                                                Jeffrey T G Kelsey (pro hac vice)
                                                 email: jkelsey@btlaw.com
13                                                BARNES AND THORNBURG LLP
                                                 11 South Meridian Street
14                                                Indianapolis, IN 46204
                                                 Phone: 317-231-6412
15                                                Fax: 317-231-7433

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated:        February 3, 2015              WARD GREENBERG HELLER AND
2                                               REIDY LLP

3                                       By:   /s/ Eric J. Ward
                                              **Attorneys for Defendant  JOHN D.**
4                                             **BRUSH & CO., INC.  d/b/a SENTRY**
                                              **GROUP**
5
                                              Audrey Karen Tan (SBN 288119)
6                                             email: atan@gibsondunn.com
                                              GIBSON DUNN AND CRUTCHER
7                                             LLP
                                              333 South Grand Avenue Suite 5400
8                                             Los Angeles, CA 90071
                                              Phone: 213-229-7707
9                                             Fax: 213-229-6707

10                                            Eric John Ward (*pro hac vice*)
                                              email: eward@wardgreenberg.com
11                                            Jessica N. Clemente (pro hac vice)
                                              email: jclemente@wardgreenberg.com
12                                            WARD GREENBERG HELLER AND
                                              REIDY LLP
13                                            300 State Street
                                              Rochester, NY 14614
14                                            Phone: 585-454-0700
                                              Fax: 585-231-1921
15
     Dated:        February 3, 2015            ICE MILLER LLP
16

17                                      By:   /s/ Kevin J. O'Shea
                                              **Attorneys for Defendant BRK**
18                                            **BRANDS, INC**

19                                            GREENBERG TRAURIG, LLP
                                              Valerie W. Ho (SBN 200505)
20                                            email: Hov@gtlaw.com
                                              1840 Century Park East, Suite 1900
21                                            Los Angeles, CA 90067-2121
                                              Phone: 310-586-7700 / Fax: 310-586-
22                                            7800

23                                            Kevin J O'Shea (*pro hac vice*)
                                              email: Kevin.O'Shea@icemiller.com
24                                            ICE MILLER LLP
                                              200 West Madison Street Suite 3500
25                                            Chicago, IL 60606
                                              Phone: 312-726-7163
26                                            Fax: 312-726-7103

27

28

1

## **L.R. 5-4.3.4 (b)(2) Attestation**

2   I attest that that all other signatories listed, and on whose behalf the filing is

3 submitted, concur in the filing's content and have authorized the filing of this

4 document.

5

6 Dated:  February 3, 2015     WARD GREENBERG HELLER &
                 REIDY LLP

7

8

9            By:  */s/ Eric J. Ward*

              Eric J. Ward

10           Attorneys for Defendant JOHN D.
            BRUSH & CO., INC. d/b/a SENTRY

11           GROUP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28