MISHCON DE REYA NEW YORK LLP
John F. Petrsoric (*Pro Hac Vice*)
Email: john.petrsoric@mishcon.com
750 7th Avenue, 26th Floor
New York, New York  10019
Telephone: 212.612.3270
Facsimile: 212.612.3297

NEWPORT TRIAL GROUP
Tyler J. Woods (SBN 232464)
Email: twoods@trialnewport.com
4100 Newport Place, Suite 800
Newport Beach, California  92660
Telephone: (949) 706-6464
Facsimile:  (949) 706-6469

Attorneys for Plaintiff
O.S. SECURITY LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| O.S. SECURITY LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BRK BRANDS, INC.<br><br>Defendant. | Case No. SACV14-00310 AG (DFMx)<br><br>Honorable Andrew J. Guilford<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| O.S. SECURITY LLC,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN D. BRUSH & CO., d/b/a SENTRY GROUP<br><br>Defendant. | Case No. SACV14-00314 AG (DFMx)<br><br>Honorable Andrew J. Guilford |

MISHCON DE REYA NEW YORK LLP

MISHCON DE REYA NEW YORK LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

O.S. SECURITY LLC,

                  Plaintiff,

      vs.

SARGENT MANUFACTURING
COMPANY, ASSA ALBOY, INC. and
ASSA ALBOY AB,

            Defendants.

Case No. SACV14-00318 AG
(DFMx)

Honorable Andrew J. Guilford

O.S. SECURITY LLC,

                  Plaintiff,

      vs.

SCHLAGE LOCK COMPANY LLC,

            Defendant.

Case No. SACV14-00319 AG
(DFMx)

Honorable Andrew J. Guilford

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................1

II.    PRINCIPLES OF CLAIM CONSTRUCTION ..................................1

     A.    The Role of Intrinsic and Extrinsic Evidence...........................1

     B.    Courts Need Not Construe Every Disputed Term .......................3

     C.    Means-Plus-Function Limitations .............................................4

III.   THE PATENTS-IN-SUIT ...................................................................5

IV.   PROPOSED CONSTRUCTIONS .......................................................5

     A.    " communication port" .............................................................5

     B.    "control station" .......................................................................9

     C.    "dedicated".............................................................................12

     D.    "electromagnetic signal".........................................................14

     E.    "enabled / disabled – activated / deactivated"........................16

     F.    "input code / input access code / access code / input key code".....18

     G.    "low-battery detection circuit" ...............................................20

     H.    "means for sensing" ................................................................21

     I.     "microprocessor is programmed to enter a code programming sequence in response to a pressing of the program key" / "code programming operation"........................................................23

     J.     "portion" .................................................................................25

     K.    "program key"........................................................................26

     L.     "sleep mode / operation mode" ..............................................28

     M.   "solenoid coupled to the lock for opening and closing the lock" ...31

     N.    "wake-up signal" ....................................................................34

     O.    "wherein a memory contains a limit value/limit value".................35

MISHCON DE REYA NEW YORK LLP

ii

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Apex Inc. v. Raritan Computer, Inc.,*
     325 F.3d 1364 (Fed. Cir. 2003) ........................................................................ 11

*C.R. Bard, Inc. v. United States Surgical Corp.,*
     388 F.3d 858 (Fed. Cir. 2004) ...................................................................... 18, 30

*Computer Docking Station Corp. v. Dell, Inc.,*
     519 F.3d 1366 (Fed. Cir. 2008) ........................................................................ 27

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.,*
     672 F.3d 1270 (Fed. Cir. 2012) .................................................................. 10, 28

*Ecolab, Inc. v. Envirochem, Inc.,*
     264 F.3d 1358 (Fed. Cir. 2001) ........................................................................ 33

*Edisync Sys. v. Centra Software, Inc.,*
     No. 03-cv-1587-WYD-MEH, 2012 U.S. Dist. LEXIS 83169
     (D. Colo. June 15, 2012) .................................................................................... 4

*Finjan, Inc. v. Secure Computing Corp.,*
     626 F.3d 1197 (Fed. Cir. 2010) .......................................................................... 4

*Helmsderfer v. Bobrick Washroom Equip., Inc.,*
     527 F.3d 1379 (Fed. Cir. 2008) .......................................................................... 2

*HTC Corp. v. IPCom GmbH & Co.,*
     667 F.3d 1270 (Fed. Cir. 2012) .......................................................................... 3

*Ibormeith IP LLC v. Mercedes-Benz USA LLC,*
     732 F. 3d 1376 (Fed. Cir. 2013) ......................................................................... 5

*Intel Corp. v. VIA Techs., Inc.,*
     319 F.3d 1357 (Fed. Cir. 2003) .......................................................................... 5

*Inventio AG v. Thyssenkrupp Elevator Ams. Corp.,*
     646 F.3d 1350 (Fed. Cir. 2011) ........................................................................ 11

MISHCON DE REYA NEW YORK LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MISHCON DE REYA NEW YORK LLP

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) .......................................................................... 2

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) .......................................................................... 4

*Mirror Worlds, LLC v. Apple, Inc.*,
   No. 6:08-CV-88-LED, 2010 U.S. Dist. LEXIS 82070
   (E.D. Tex. Aug. 11, 2010) .......................................................................... 4, 9, 27

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S.Ct. 2120 (2014) .......................................................................... 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008) .......................................................................... 4, 32

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008) .......................................................................... 3

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) .......................................................................... 18, 19

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
   386 F.3d 1133 (Fed. Cir. 2004) .......................................................................... 3

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................... 1, 2, 3, 27

*In re Rambus*,
   694 F.3d 42 (Fed. Cir. 2012) .......................................................................... 9, 28

*Thorner v. Sony Computer Entm't Am. L.L.C.*,
   669 F.3d 1362 (Fed. Cir. 2012) .......................................................... 2, 3, 15, 21

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) .......................................................................... 3, 4

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) .......................................................................... 3

**Statutes**

35 U.S.C. § 112.......................................................................... 9, 22, 25

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MISHCON DE REYA NEW YORK LLP

35 U.S.C. § 112(6) ................................................................4, 11, 22

35 U.S.C. § 112(6)(f) ...........................................................11, 12, 22

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

1    **I.    INTRODUCTION**

2           Pursuant to S.P.R. 3.5 and the Court's December 5, 2014 Minute Order,

3    Plaintiff O.S. Security LLC ("OSS") provides its opening claim construction brief

4    addressing the fifteen terms identified in the parties' January 9, 2015 *Joint Claim*

5    *Construction and Prehearing Statement Pursuant to S.P.R. 3.4*.

6    **II.    PRINCIPLES OF CLAIM CONSTRUCTION**

7           The principles of claim construction are well-settled, and the methodology

8    for applying these principles in construing claim terms is straightforward.  A

9    correct application of the principles of claim construction follows two basic steps:

10   (1) giving a term its ordinary meaning, i.e., its meaning to one skilled in the art

11   after reading the entire patent; and (2) determining whether the patentee diverted

12   from this ordinary meaning by giving a special definition (referred to as

13   "lexicography") for the claim term or by disclaiming a portion of the term's

14   ordinary meaning.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir.

15   2005) (en banc).  This methodology—prescribed by the Federal Circuit en banc in

16   *Phillips*—is authoritative, and it can be applied consistently to resolve claim

17   construction disputes.

18          **A. The Role of Intrinsic and Extrinsic Evidence**

19          In *Phillips* and previously in *Vitronics Corp. v. Conceptronic, Inc.*, the

20   Federal Circuit identified a hierarchy of sources for conducting the claim

21   construction analysis.  *Phillips*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc)

22   ("In Vitronics, this court . . . set forth guidelines for reaching the correct claim

23   construction . . . [t]oday, we adhere to that approach and reaffirm the approach to

24   claim construction outlined in that case . . .");  *Vitronics*, 90 F.3d 1576, 1582 (Fed.

25   Cir. 1996).  Specifically, the "intrinsic evidence is the most significant source of

26   the legally operative meaning of disputed claim language."  *Vitronics*, 90 F.3d at

27   1582.  Indeed, where the intrinsic evidence is unambiguous as to the scope of the

28   patented invention, reliance on extrinsic evidence is improper.  *Id.* at 1583.  The

MISHCON DE REYA NEW YORK LLP

1

1    intrinsic evidence includes: the claims themselves; the specification; and the

2    prosecution history.  *Id.* at 1582.

3         The analysis starts with a "look to the words of the claims themselves, both

4    asserted and nonasserted, to define the scope of the patented invention."  *Id.*  Citing

5    to Supreme Court precedent of over a century ago, the *Phillips* court reiterated that

6    the claims are "of primary importance, in the effort to ascertain precisely what it is

7    that is patented."  *Phillips*, 415 F.3d at 1312 (citing *Merrill v. Yeomans*, 94 U.S.

8    568, 570 (1876)).  "[T]he words of a claim 'are generally given their ordinary and

9    customary meaning.'"  *Id.* at 1312 (quoting *Vitronics*, 90 F.3d at 1582).  Attempts

10   to rewrite claims should therefore be rejected.  *See K-2 Corp. v. Salomon S.A.*, 191

11   F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give

12   effect to the terms chosen by the patentee.").

13        After the claims themselves, "the specification is always highly relevant to

14   the claim construction analysis.  Usually, it is dispositive; it is the single best guide

15   to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315.  "The specification

16   may reveal a special definition given to a claim term by the patentee that differs

17   from the meaning it would otherwise possess."  *Id.* at 1316.  This is often referred

18   to as the patentee acting as its own lexicographer.  "To act as its own

19   lexicographer, a patentee must clearly set forth a definition of the disputed claim

20   term other than its plain and ordinary meaning."  *Thorner v. Sony Computer Entm't*

21   *Am. L.L.C.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotations omitted).[1]

22        The only other acceptable way in which claim scope may be limited is if the

23   patentee disavows claim scope by demonstrating "intent to deviate from the

24   ordinary and accustomed meaning of a claim term by including in the specification

25

26   [1]  *See also Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381

27   (Fed. Cir. 2008) (the inventor's definition controls "when they clearly express an
     intent" to define a term); *Vitronics*, 90 F.3d at 1582. ("The specification acts as a

28   dictionary when it expressly defines terms used in the claims").

MISHCON DE REYA NEW YORK LLP

2

1  expressions of manifest exclusion or restriction, representing a clear disavowal of

2  claim scope." *Thorner*, 669 F.3d at 1366-67 (internal quotations omitted) ("We do

3  not read limitations from the specification into claims; we do not redefine words.

4  Only the patentee can do that. To constitute disclaimer, there must be a clear and

5  unmistakable disclaimer.").   Moreover, the Court should not normally "interpret

6  claim terms in a way that excludes embodiments disclosed in the specification."

7  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008).[2]

8      After the specification, the court may consider the prosecution history of the

9  patent. *Phillips*, 415 F.3d at 1317.  But while the prosecution history can offer

10  insight into the meaning of a particular claim term, the "[c]laim language and the

11  specification generally carry greater weight." *HTC Corp. v. IPCom GmbH & Co.*,

12  667 F.3d 1270, 1276 (Fed. Cir. 2012).

13      Finally, if the intrinsic sources of meaning are unclear, a court may turn to

14  extrinsic evidence, anything that is external to the patent and file history, e.g.,

15  dictionaries and expert testimony. *See Phillips*, 415 F.3d at 1317.   Extrinsic

16  evidence in general is "less reliable than the patent and its prosecution history in

17  determining how to read claim terms," *id.*, at 1318, and "[i]n those cases where the

18  public record unambiguously describes the scope of the patented invention,

19  reliance on any extrinsic evidence is improper." *Vitronics*, 90 F.3d at 1583.

20      **B. Courts Need Not Construe Every Disputed Term**

21      "Claim construction is a matter of resolution of disputed meanings and

22  technical scope, to clarify and when necessary to explain what the patentee covered

23  by the claims, for use in the determination of infringement." *U.S. Surgical Corp.*

24

25  [2]  *See also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305

26  (Fed. Cir. 2007) (rejecting proposed interpretation that would exclude disclosed
    embodiments); *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386

27  F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a
    preferred embodiment from the scope of the claim is rarely, if ever, correct.")

28  (internal quotations omitted).

3

MISHCON DE REYA NEW YORK LLP

*v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Furthermore, the claim construction process "is not an obligatory exercise in redundancy."  *Id.*  District courts "are not (and should not be) required to construe every limitation present in a patent's asserted claims,"  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008), even though "it is the court's duty to resolve" a "fundamental dispute regarding the scope of a claim term."  *Id.*  When the "claim language is clear to a lay jury who will understand the term," the Court may properly resolve the dispute by rejecting the unnecessary and unhelpful construction proposed by defendants and holding that the term will have its plain and ordinary meaning.  *Mirror Worlds, LLC v. Apple, Inc.*, No. 6:08-CV-88-LED, 2010 U.S. Dist. LEXIS 82070, at *20 (E.D. Tex. Aug. 11, 2010).[3]

## C. Means-Plus-Function Limitations

"Under 35 U.S.C. § 112, ¶ 6 (now subsection (f)), a patentee may express a claim limitation as a "means or step for performing a specified function without the recital of structure, materials, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.  When construing means plus function limitations, the specification "must be read ***as a whole*** to determine the structure capable of performing the claimed function." *Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365, 1379 (Fed. Cir. 2001)* (emphasis added).  Because patents are written for persons experienced in the field of the invention, whether the written description adequately sets forth the structure corresponding to the claimed function must be considered from the perspective of

---

[3] *See also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (Affirming district court's rejection of defendants' attempts to "resurrect a claim construction that the district court had already rejected, without offering a new definition."); *Edisync Sys. v. Centra Software, Inc.*, No. 03-cv-1587-WYD-MEH, 2012 U.S. Dist. LEXIS 83169, at *41 (D. Colo. June 15, 2012) ("[T]he phrase 'given computer file' is comprised of easily understood terms . . . Therefore, I find the term requires no additional construction.").

MISHCON DE REYA NEW YORK LLP

a person skilled in the art.  *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1365-66 (Fed. Cir. 2003).  "[T]he patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Ibormeith IP LLC v. Mercedes-Benz USA LLC*, 732 F. 3d 1376, 1379 (Fed. Cir. 2013).

## III.    THE PATENTS-IN-SUIT

OSS has asserted forty-three (43) claims from nine patents against the defendants in these actions.  The nine patents are U.S. Patent Nos. 5,617,082 ("the '082 patent"); 6,359,547 ("the '547 patent"); 6,977,576 ("the '576 patent"); 7,019,615 ("the '615 patent"); 7,295,100 ("the '100 patent"); 7,456,725 ("the '725 patent"); 7,482,907 ("the '907 patent"); 7,683,758 ("the '758 patent"); and 8,587,405 ("the '405 patent").  The forty-three asserted claims are attached to the *Declaration of John Petrsoric* ("Petrsoric Decl.") as Exhibit 1.  A copy of the oldest patent, the '082 patent, is attached to the Petrsoric Decl. as Exhibit 2.  Of remaining eight patents, the seven apart from the '405 patent share a common specification that was continued-in-part from the '082 patent.  A copy of the '576 patent is attached to the Petrsoric Decl. as Exhibit 3.  The '405 patent was a continuation-in-part from the '907 patent.

## IV.    PROPOSED CONSTRUCTIONS

### A.    " communication port"

| Asserted Patents/claims: '576 (cl. 11); '615 (cl. 18, 19); '100 (cl. 39, 91); '758 (cl. 17, 18); '405 (cl. 1, 12) | |
|---|---|
| OSS' Construction | Defendants' Construction |
| | |

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

| An input and/or output where data is transmitted | - Sentry - An input/output (I/O) hardware interface for the bidirectional transfer of data, to permit external programming of the memory.<br><br>- Sargent - *As to '576 and '100 Patents:*<br>"hardware connection point that is part of a direct physical (as opposed to partially wireless) communication path between electronics housed inside the electronic access control device and an electronic system outside of and distinct from the electronic access control device<br>*As to '615 and '405 Patents:*<br>"hardware connection point that is part of a direct physical (as opposed to wireless) communication path to electronics housed inside the electronic access control device"<br><br>- Schlage - a hardware socket to permit external programming of the non-volatile memory |

Defendants' constructions for "communication port" improperly insert numerous limitations from the specification as well as from the claims themselves in an attempt to manufacture a non-infringement position.  Sargent even goes so far as to propose *different* constructions for the same term used in the same patent family, contrary to canons of claim construction provided by the Federal Circuit. Defendants' proposed constructions are unsupported by the intrinsic record and in some cases, run contrary to the specification.  OSS' proposed construction does not import any of these limitations and is strongly supported by the intrinsic record.

Although the '576, '100, '615, and '405 patents are all related patents in the same patent family and share at least parts of a common specification, Sargent has proposed one construction for some of the patents and another construction for other patents.  A "communication port" is a commonly used term in the art and would have been understood by a person of ordinary skill in the art to be "an input and/or output where data is transmitted" as OSS proposes.  The construction Sargent has proposed for "communication port" in the '615 and '405 patent narrows OSS' proposed construction by requiring the "communication port" be limited to a "direct physical (as opposed to wireless) communication path to

MISHCON DE REYA NEW YORK LLP

electronics housed inside the electronic access control device."[4]  This construction is contrary to the claims and the specification of the patents.  As the specification never restricts the "communication port" to operate only in such a manner, it appears Defendants are taking limitations from certain claims and importing them into "communication port."  Not only does this contradict Federal Circuit law, but such a construction would exclude claims that use "communication port" without such limitations.  For example, claim 4 of the '405 patent claims a battery-powered electronic-access control system which "receives a code through the communication port from a device *remote* to the battery-powered electronic-access control system[.]" (D.I. 1, Ex. H, Cl. 4.)  As the device transmitting the code is remote to the electronic-access control system, they cannot be joined by a direct physical connection.  It is not possible for Defendants' restrictive construction of "communication port" to comport with this claim.

Sargent's construction would also read out preferred embodiments in the patent.  In one embodiment, the patent depicts a communication port in an access control device.  ('576, Fig. 3 (element 15).)  The patent then describes:

> "In this embodiment, the data stream is input serially into the microprocessor 14 so that a variety of serial inputs may be connected to the input of the microprocessor 14 . For example , the access code may be input using a traditional keypad 11 transmitting data in serial mode. Moreover, the data may be input serially *using an electromagnetic signal input from the radio frequency ( RF ) , optical frequency or infrared frequency bands*"

> ('576, col. 10, lines15-22; Fig. 3 (emphasis added).)

---

[4] It is unclear from Sargent's wording whether they construe "communication port" to be part of a physical end-to-end connection or simply a physical connection on one end.  OSS addresses the former here.  Although OSS does not dispute that the patent uses the "communication port" as part of a physical connection on one end, construing this term to inherently include such a limitation is not warranted.

7

MISHCON DE REYA NEW YORK LLP

1    As the patents specifically articulate multiple formats of communication via

2  the communication port that consist of wireless communications, Sargent's

3  construction of limiting "communication port" to "part of a direct physical (as

4  opposed to wireless) communication path" is directly contrary to the

5  specification.  The patents further describe an embodiment of the invention in a

6  bicycle application which explicitly uses a wireless RF signal to communicate

7  with the communication port.  ('576, col. 17, lines 38-57; Fig. 16.)  Sargent's

8  construction would exclude this preferred embodiment from the claims of the

9  patent.  "Such an interpretation is rarely, if ever, correct and would require highly

10  persuasive evidentiary support[.]" *Vitronics*, 90 F.3d at 1583.

11    Sargent's proposed construction for the same term with respect to the '576

12  and '100 patents differs from the above proposed construction for the '615 and

13  '405 patents.  For the '576 and '100 patents, Sargent proposes "communication

14  port" not only to be construed to require communication with electronics inside a

15  housing, but also to communicate with "an electronic system outside of and

16  distinct from the electronic access control device."[5]  Sargent's differing

17  constructions for the same term in the same patent family is telling.  Sargent

18  clearly declined to include this additional limitation in its proposed construction

19  for the '615 and '405 patents because even it realized it could not reconcile this

20  construction with the claims of the '615 and '405 patents.  For example, claim 18

21  of the '615 patent includes "at least two communication ports operatively coupled

22  to the control circuit . . . the second port dedicated to reading an access code from

23  the non-volatile memory[.]"  (D.I. 1, Ex. C, Cl. 18.).  The second communication

24  port claimed in claim 18 facilitates communication between the control circuit

25  and the non-volatile memory.  Both components are clearly within the same

26

27  _____

28  [5] Defendants Schlage and Sentry propose constructions containing similar,
    although more ambiguous limitations, in requiring the "communications port" to
    be used for "external programming of the [non-volatile] memory."

8

MISHCON DE REYA NEW YORK LLP

1    device.  (*See* '576, col. 1, lines 36-39 ("In this device, and other common

2    electronic access control devices, a microprocessor is used in combination with a

3    keypad and an electrically programmable read only memory (EPROM)").  It is

4    well-settled that the same claim term in the same patent family carries the same

5    construed meaning.  *See In re Rambus*, 694 F.3d 42, 48 (Fed. Cir. 2012) ("The

6    parties agree that 'unless otherwise compelled . . . the same claim term in the

7    same patent or related patents carries the same construed meaning.'")(*quoting*

8    *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003)).  Thus,

9    the Defendants' proposed constructions improperly limit "communication port"

10   as it is used in the patent and must be rejected.  OSS' construction for

11   "communication port" should be adopted.

**B.     "control station"**

| Asserted Patents/claims: '082 (cl. 082) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| No construction necessary | - Sargent - an active control device adapted to generate and transmit a coded signal<br><br>- Schlage - "control station," as in the claimed "control station for transmitting an electromagnetic signal containing an access code" is subject to 35 U.S.C. § 112 (f/6)<br>**Function:**<br>Transmitting a radio frequency signal set at 320 MHz, an optical signal, or an infrared signal containing an access code<br>**Structure:**<br>This patent fails to disclose structure sufficient to perform the function and is thus invalid under § 112. The only structure disclosed is:<br>a hand-held control unit 59 of FIG. 6 with a button 58 to activate an RF transmitter *See* the '082 Patent at col. 7, lines 27-44; col. 8, lines 19-46; FIG. 6 (and relevant description). |

22       The term "control station" is not only easily have been understood by a

23   person of ordinary skill in the art but is in fact easily understood by a lay person.

24   The term itself is made up of two words that have a common well-understood

25   meaning which the patentee did not depart from in the claims or the specification.

26   *Mirror Worlds,* 2010 U.S. Dist. LEXIS 82070 at *20.  Thus, it is not necessary

27   for the Court to construe this term.

28       Sargent's proffered construction attempts to add several limitations to the

meaning of this term including that the control station must generate and transmit a coded signal. Although each claim of the '082 patent that uses control station – namely asserted claim 21 and claim 32 – requires that the control station transmit a coded signal, this use of term with these limitations does not justify interpreting the term itself to inherently require this action. Such a construction would render the additional limitations provided in claim 21 and 32 superfluous which is "contrary to the well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (quotations omitted). For example, claim 21 requires "a control station for transmitting an electromagnetic signal containing an access code[.]" ('082, claim 21). Sargent's construction would require "an active control device adapted to generate and transmit a coded signal for transmitting an electromagnetic signal containing an access code." There is no reason why the patentee would have sought to patent such nonsensical subject matter. Such a construction would not add to the meaning of the claims but would only serve to confuse a jury.

Sargent also attempts to require that the "control station" be "active". However, nowhere in the patent is an active (nor inactive) control station discussed. Construing control station to be an "active control station" would introduce ambiguity as to the scope of the claims that use "control station." The only context in which the patent discusses a device being "active" is in the context of the low power mode, or sleep mode, used by the remote access devices. ('082, abstract; col. 7, lines 3-5). As discussed above, the remote access devices are the devices with which the control station communicates, and are not the control stations themselves. The patent explains that the use of a solenoid in access devices for opening the lock is power intensive. ('082, col. 1, lines 56-59). The purpose of the low power mode is to decrease power consumption by the remote access devices. ('082, col. 2, lines 59-63). By contrast, the control station

MISHCON DE REYA NEW YORK LLP

10

is used to *operate* the access device, and does not contain a locking mechanism such as a solenoid which requires a significant amount of power to operate.  As power consumption is not relevant to the control station, the entire concept of an "active" state as used in the patent has no applicability to the term "control station."

Schlage's position regarding control station is even more untenable. Schlage submits that "control station" requires construction but then fails to offer a construction.  Instead, Schlage argues that the "control station" is somehow claimed in means-plus-function form under 35 U.S.C. § 112 ¶6/f.  However, "control station" does not use the word "means."  Schlage must therefore provide sufficient evidence to overcome the "strong presumption" that § 112 ¶6/f does not apply.  *See Inventio AG v. Thyssenkrupp Elevator Ams. Corp.,* 646 F.3d 1350, 1356 (Fed. Cir. 2011) ("[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."); *Apex Inc. v. Raritan Computer, Inc.,* 325 F.3d 1364, 1371 (Fed. Cir. 2003) (In order to rebut the presumption that Section 112 ¶6 does not apply, Defendants must show that the claim term does not have "a reasonably well understood meaning in the art.").

As discussed above, the term "control station" is readily under by persons of ordinary skill in the art.  The patent describes a control station as a station "whereby each of the devices may be accessed."  ('082, col. 6, lines 65-67).  Such a component is commonly used in any system involving a communication signal. The Patent Office recognized as much during the prosecution of the '082 patent. In discussing a prior art reference, the examiner noted that "Hirano, in the same field of endeavor relative to automobile, discloses a transmitter unit 100 (equivalent to claim 22's 'control station for transmitting an electromagnetic signal')…"  (A000139.)  Thus, it was well-understood that a control station was simply a component for controlling another device.  Just as the examiner recognized that "control station" is interchangeable with "transmit unit", the

MISHCON DE REYA NEW YORK LLP

11

patent uses the term "control station" and "control unit" interchangeably. The specification describes another embodiment of the "control station" where the "control station" transmits an RF signal to a receiver on the access device. The "control station" is further depicted in Figure 7 (element 59). In the parties' joint submission of proposed constructions to the Court, Sargent submitted two definitions from technical dictionaries as extrinsic support for the term "control station" confirming that the term "control station" was well-understood in the art. The knowledge of a person of ordinary skill in the art combined with the numerous examples of the "control station" in the specification establishes that Schlage cannot overcome the presumption that "control station" is <u>not</u> subject to § 112 ¶6/f.

A person of ordinary skill in the art would understand the scope of the term "control station," as would a jury. Adopting either Sargent or Schlage's construction is improper and would add a significant amount of confusion to an otherwise simple term. Defendants' constructions should be rejected as the plan and ordinary meaning of term is sufficiently clear for a jury to determine the scope of the claims.

### C.  "dedicated"

| Asserted Patents/claims: '615 (cl. 18, 19) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| No construction necessary | - Sargent - designated exclusively for a specific use or function |
| | - Schlage - "dedicated" means used solely to, *e.g.*, as in "dedicated to writing and reading an access code" means used solely to write and read an access code |

The term "dedicated" is a common word with a well-understood meaning. The patentee's use of this word does not depart from this plain and ordinary meaning. Nevertheless, Defendants argue that this term requires construction in an attempt to narrow the scope of the claims in which "dedicated" is used. The dictionary definition provided by Sargent, "[d]esignated for a specific use or function." This ordinary meaning is how the term is used in the patent.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

1   Defendants, however, have once again manufactured an additional limitation.

2   Defendants' attempts are made obvious by examining Sargent's supplied

3   dictionary definition with Sargent's proposed construction.  As stated above,

4   Sargent's supplied dictionary definition is "[d]esignated for a specific use or

5   function."  Sargent's proposed construction, however, is "designated *exclusively*

6   for a specific use or function." (emphasis added).  Sargent cites to nothing to

7   justify the insertion of the word "exclusively."  Sargent's construction is clearly

8   not supported by its own dictionary definition, as the word "exclusively" appears

9   nowhere in this definition.  Furthermore, in the parties' joint submission of

10  proposed constructions, Sargent provided no citations to the intrinsic record in

11  support of this construction.  The sum total of Sargent's argument is the naked

12  assertion that "exclusively" should be inserted into the definition of "dedicated."

13  Without any supporting evidence whatsoever, this assertion should be rejected.

14          Schlage fairs no better in supporting its proposed construction.

15  Schlage's proposed construction, "used solely to" differs in wording from

16  Sargent's, but shares the same attempt to insert an exclusionary element into the

17  meaning of "dedicated" as Sargent attempted with "exclusively."  Schlage did not

18  provide any dictionary definitions.  An examination of the intrinsic records not

19  only finds nothing to indicate the patentee departed from the plain and ordinary

20  meaning of "dedicated," but shows that the specification teaches away from

21  inserting "exclusively" or "solely" into the meaning of "dedicated."  The term

22  dedicated is used in claims 18 and 19 of the '615 patent in the context of

23  describing a "second [communication] port *dedicated to reading* an access code

24  from the non-volatile memory" and a "second [communication] port *dedicated to*

25  *writing and reading* an access code from the non-volatile memory," respectively.

26  (emphases added).  The patent describes its use of communication ports in several

27  embodiments.  (*See, e.g.*, '576, col. 3, lines 39-42("The electronic access control

28  device of the present invention has a communication port connected to selected

M<span>ISHCON DE</span> R<span>EYA</span> N<span>EW</span> Y<span>ORK</span> LLP

13

1  pins of the microprocessor IC for accessing the non-volatile memory for storing

2  an access code.").)  One of the advantages of the patented invention over the prior

3  art was the reduction in the number of pin connections required by the access

4  devices.  The patents accomplished this by multiplexing pins of the

5  microprocessor as explained in the specification:

> First, there is provided an electronic access control device which reduces
> the number of pin connections required to manufacture, to read, to
> program, and to operate the device.  The device multiplexes the inputs and
> outputs of the microprocessor IC so that a single pin can function as an
> input in one mode and an output in another. The microprocessor
> determines, based on the mode of operation, whether a pin functions as an
> input or an output.

('576, col. 3, lines 30-39).

Thus, the patents specifically teach a pin connected to a communication

port could be used for one purpose in one mode, and an entirely different purpose

in another mode.  A "dedicated" communications port, on the other hand, would

be designated for a specific use.   However, nothing in the intrinsic record suggest

that the dedicated communications port could not also perform other functions in

addition to that specific use.  Indeed, it was the aim of the invention to allow

communications ports and input/output pins to perform multiple functions to

reduce the number of pins needed on each device.  Excluding a communications

ports dedicated to a specific use from performing any other function would run

counter to one of the objects of the patented invention.  Defendants' constructions

should be rejected and the plain and ordinary meaning of this "dedicated" should

be adopted.

### D.   "electromagnetic signal"

| Asserted Patents/claims: '082 (cl. 21, 22); '725 (cl. 1, 7); '907 (cl. 11, 46); '758 (cl. 14, 72); '405 (cl. 12) | |
| --- | --- |
| OSS' Construction | Defendants' Construction |
| No construction necessary | - Schlage - a radio frequency signal at 320 MHz, an optical signal, or an infrared signal |

This term is present in claims asserted against only Sargent and Schlage.

MISHCON DE REYA NEW YORK LLP

14

MISHCON DE REYA NEW YORK LLP

1   Sargent did not identify the term for construction pursuant to S.P.R. 3.1,

2   presumably because it is a straightforward term whose scope is well known to a

3   person having ordinary skill in the art.  OSS therefore contends that the term does

4   not require construction.  Schlage proposes that the term be construed as "a radio

5   frequency signal at 320 MHz, an optical signal, or an infrared signal."  The basis

6   for this construction appears to find its root in the specification: "the data may be

7   input serially using an electromagnetic signal input from the radio frequency

8   (RF), optical frequency or infrared frequency bands." ('082, col. 7, lines 30-32.)

9   Schlage modifies the language of that passage to limit the RF frequency to exactly

10  320 MHz, presumably relying on the following portion of the specification:  "In

11  the present invention, the frequency is set at 320 MHz." ('082, col. 8, lines 21-

12  22.)

13          To the extent that Schlage (and Sargent to the extent they are now joining

14  in Schlage's construction) is arguing that the frequency "is set at 320 MHz" in the

15  "present invention" acts as a disclaimer, this argument must be rejected.  Any

16  disclaimer must be "clear and unmistakable." *See, e.g., Thorner*, 669 F.3d at

17  1366-67.  When read in the light of the entire specification, the sentence in

18  column 8 cannot be taken as a disavowal of claim scope.  First, as cited above,

19  the specification clearly discusses electromagnetic signal in the broad context of

20  "radio frequency (RF), optical frequency or infrared frequency bands" ('082, col.

21  7, lines 30-32.)  Moreover, in the sentence following the one on which Schlage

22  presumably relies, the patentee makes it clear that the frequency setting of 320

23  MHz is exemplary:  "In the present invention, the frequency is set at 320 MHz. A

24  burst of frequency is detected by the Q1 and Q2 transistors with their circuits

25  tuned to the correct frequency (***320 MHz in this example***)." ('082, col. 8, lines

26  21-24.)

27          The patentee clearly did not intend to limit the scope of electromagnetic

28  signal to a particular frequency and the Defendants' arguments should be rejected.

15

MISHCON DE REYA NEW YORK LLP

The term does not require construction and it was only proposed for construction to create a path to non-infringement where none existed.   However, should the Court believe construction of the term is necessary, OSS proposes a derivation of Schlage's proposal, removing the 320MHz limitation:  "a signal in the radio, optical or infrared frequency bands."

### E.  "enabled / disabled – activated / deactivated"

Asserted Patents/claims: '576 (cl. 8); '615 (cl. 2); '100 (cl. 30, 89); '725 (cl. 7); '907 (cl. 11, 15, 46);  '758 (cl. 14, 17, 18, 72); '405 (cl. 1, 12);

| OSS' Construction | Defendants' Construction |
|---|---|
| No construction necessary | - BRK Brands and Sargent - turned on and consuming electrical power / turned off and consuming no electrical power |
| | - Sentry - Enabled / activate / activating: turned on and consuming electrical power Disabled: turned off and consuming no electrical power. |
| | - Schlage - current is flowing through the circuit / no current is flowing through the circuit |

These pairs of terms are well known, not to just persons having ordinary skill in the art, but also a lay person.  In an effort to again create a path to non-infringement where none exists, Defendants seek to add limitations to already simple terms.  In doing so, they provide two separate constructions that share a similar approach:

| Enabled / Activated | Disabled / Deactivated |
|---|---|
| Turning on and consuming electrical power | Turned off and consuming no electrical power |
| Current is flowing through the circuit | No current is flowing through the circuit |

Defendants' proposals are wrong because both sets of proposed constructions run contrary to the preferred embodiment.  To understand this, a review of the manner in which these pairs of terms are used in the claims is required.  They are used widely in the asserted claims of the '576, '615, '100, '725, '907, '758 and '405 patents to define the operation of the following claim elements:

1)     low-battery detection circuit - '576 (cl. 1); '615 (cl. 2); '100 (cl. 30, 89); '576 (cl. 1); '907 (cl. 15); '758 (cl. 14, 72);

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

'405 (cl. 1)
2)      other circuits  - '725 (cl. 7); '907 (cl. 11, 46); '758 (cl. 14, 72); '405 (cl. 12)
3)      processor / microprocessor - '907 (cl. 11, 46); '758 (cl. 17, 18, 72); '405 (cl. 1,12);

While the specifications of the asserted patents describe the low-battery detection circuit as drawing no power (*see, e.g.,* '576 patent, col. 12, ll. 33-36, "the microprocessor-based control circuit further includes a low-battery detection circuit 68 that does not consume electrical power except when a low-battery detection is in progress") when it is not operational, i.e., disabled or deactivated, the specification makes clear that the functionality of the other circuitry and the processors is otherwise:

The accessed device is designed for low power consumption so that it may operate on a battery for an extended period of time. ***The remote access device is normally in a sleep mode. In other words, the device is not in active operation.*** The remote device can "wake-up" from the low power sleep mode in a variety of ways. One method is for the circuitry in the sleep mode device to sense the incoming signal. When the signal is sent, the remote device resumes normal operation. Another method is for the circuitry in the sleep mode device periodically to resume normal operation and sense if there is an incoming signal. If the incoming signal is sent, the circuitry is able to receive the bitstream data that contains the access code. ***The circuitry thus remains in a low-power sleep-mode condition for the majority of the time, dissipating low power, while no signal is received.***

('576, col. 9, line 58 – col. 10, line 5 (emphasis added).)

Normally, ***in sleep mode, pins R1, R2, R3 and R4 [of the microprocessor] are waiting for an input***. When, for example, the keypad "3" is input, pin R1, which keypad "3" is connected to, is triggered signifying to the microprocessor 14 that an interrupt has occurred. The microprocessor 14 then executes an interrupt in the software program and changes one of the four pins (R1, R2, R3 and R4) into an output whereby a logic high is sent to the R1 pin.

('576, col. 6, lines 44-51 (emphasis added), *see also* Figure 3.)

Defendants "no power" (i.e., "no current") proposals reads out the

MISHCON DE REYA NEW YORK LLP

preferred embodiment, where the microprocessor and other circuitry are drawing <u>low power</u> in the sleep mode.  A claim construction that reads out a preferred embodiment is "rarely correct."  *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004); *see also Vitronics*, 90 F.3d at 1583.  In addition, Defendants have not suggested that these term pairs should be construed differently based on context (i.e., why a term should carry a different meaning in different claims) and any suggestion to do so should be rejected.  "Unless otherwise compelled . . . the same claim term in the same patent or related patents carries the same construed meaning."  *Omega Eng'g,* 334 F.3d at 1334 (citations omitted).

For these reasons, these terms do not require construction and constructions were only proposed to create non-infringement where none existed.  This should be rejected.

### F.    "input code / input access code / access code / input key code"

| Asserted Patents/claims: '576 (cl. 7,10, 15); '615 (cl. 1, 4, 9, 18, 19) '100 (cl. 30, 88); '725 (cl. 1, 7); '907 (cl. 11, 46); '758 (cl. 14, 72); '405 (cl. 1, 12) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| A code (e.g. a series of keys and/or an electronic key) for accessing a secure area | - BRK Brands, Sentry and Schlage – Indefinite<br><br>- Sargent - *As to "input code" in '758, '725, and '907 Patents:* input code communicated via said electromagnetic signal set at 320 MHz<br>*As to terms appearing in '576, '615, '100, and '405 Patents:* No construction necessary |

OSS proposes these like terms be construed as "a code (e.g. a series of keys and/or an electronic key) for accessing a secure area".  As even a lay person can understand, the input code can be readily understood as the code that is entered into an electronic lock, either by pressing keys on a keypad, or using an electronic key to send an input code.  This "input code/input access code/input key code" is the code that is then compared internally in the lock against a stored "access code".  ('576, col. 3, lines 65-67)  If the "input access code" matches the stored "access code" then the electronic lock will allow access to a secure area (i.e. a

MISHCON DE REYA NEW YORK LLP

MISHCON DE REYA NEW YORK LLP

safe, doorway, or the like).  Defendants audaciously propose that this very basic function of a lock is somehow indefinite[6] or specifically requires a 320 MHz electromagnetic signal in certain claim contexts.  Neither of these positions is defensible.

The patents describe how an access code can be manually entered on a keypad, i.e., via a series of keys, ('576, col. 8, lines 53-59), and how an electronic key can be used to transmit an electronic signal with the access code ('576, col. 17, lines 12-16).  Furthermore, the patents specifically contrast the keypad and electronic key approaches:

> Some electronic locks are provided with electronic keys. When an electronic key is presented to a key reader of an associated electronic lock, it transmits an access code to the electronic lock. ***By using an electronic key, the user does not have to enter manually the access code by means of a keypad***.  In certain applications, a remote control unit is used which has a radio transmitter to send the access code to the lock without direct electrical contact with the electronic lock.

('576, col. 2, lines 31-39(emphasis added); *see also* col. 14, lines 19-22.)

With respect to the '576, '615, '100 and '405 patents, Sargent asserts that no construction is necessary.  While OSS believes construction would be helpful to a lay jury, it is amenable to agreeing that no construction is necessary.  With respect to the '758, '725 and '907 patents, Sargent seeks to import the 320 MHz limitation it seeks with respect to "electromagnetic signal."  As discussed, supra, in Section IV.D, this is an improper attempt to limit claim scope and should be rejected.  Moreover, Sargent has not suggested that these terms should be construed differently based on context (i.e., why a term should carry a different meaning in different claims) and any suggestion to do so should be rejected.  "Unless otherwise compelled . . . the same claim term in the same patent or related patents carries the same construed meaning."  *Omega Eng'g,* 334 F.3d at

---

[6] Defendants bear the burden of proof in their claim of indefiniteness.  OSS expects to respond to any offer of such proof in its responsive brief.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

1334 (citations omitted).  For at least these reasons, the Court should adopt OSS'
consistent proposed construction.

### G.    "low-battery detection circuit"

| Asserted Patents/claims: '576 (cl. 8); '615 (cl. 2); '100 (cl. 30, 89); '907 (cl. 15, 47); '758 (cl. 14, 72); '405 (cl. 1) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| A circuit that determines whether measured battery voltage is below a certain level | - BRK Brands - A circuit that generates a reference voltage when turned on, and compares the reference voltage to the voltage of the battery |
| | - Sentry - A circuit including a voltage divider and a first transistor to compare a voltage of a battery and a reference voltage, and a second transistor disposed in series with the voltage divider to selectively turn the current through the voltage divider on and off. |
| | - Sargent - No construction necessary |
| | - Schlage - a circuit that turns on and off and generates a reference voltage and compares the reference voltage to the voltage of the battery |

As OSS proposes, a "low battery detection circuit" is simply "a circuit that
determines whether measured battery voltage is below a certain level."  In the
alternative, no construction is necessary, as Sargent proposes.  As even many a
lay person understands, when the capacity of a battery is impaired, its output
voltage will drop.  To detect this impairment, a circuit is used to determine
whether that voltage is below a certain threshold.  OSS' proposed construction
thus gives the term its ordinary meaning.  Defendants BRK, Sentry, and Schlage,
however, seek to incorporate limitations from the specification without any
suggestion that claim scope has been disclaimed.  For example, Sentry seeks to
include "a voltage divider and a first transistor to compare a voltage of a battery
and a reference voltage, and a second transistor disposed in series with the voltage
divider to selectively turn the current through the voltage divider on and off."
While this may be the description of the preferred embodiment, its incorporation
into the claims is improper.   Any "intent to deviate from the ordinary and
accustomed meaning of a claim term" must be accompanied by "expressions of

MISHCON DE REYA NEW YORK LLP

manifest exclusion or restriction, representing a clear disavowal of claim scope." *Thorner*, 669 F.3d at 1366-67.  Defendants can point to none here.

As another example, BRK and Schlage's proposed constructions make reference to the circuit "turning on" and "turning off."  These limitations are already expressly present in most, if not all, of the asserted claims and the further inclusion in the proposed construction only adds redundancy and ambiguity. Examples of the express limitations of the claim language are as follows:

- a low-battery detection circuit that is enabled by the microprocessor in the operation mode for measuring a voltage of the battery and disabled when the microprocessor is in the sleep mode ('100, claim 30)

- a low battery detection circuit that correlates a reference voltage to a voltage associated with a battery, and wherein the low battery detection circuit is either disabled, selectively enabled or initiated for applying the reference voltage and for correlating the voltage associated with the battery in the awake mode, the low-battery detect circuit having an enabled mode distinct from the active mode of the first or the second processor ('405, claim 1)

Rather than assisting a jury understand the scope of the claims, Defendants' proposed constructions inappropriately limits this term, adding confusion to an otherwise easily understood term.  OSS' proposed construction comports with a person of ordinary skill in the art would understand this term while giving full meaning the other terms of the claims.

**H.**     **"means for sensing"**

| Asserted Patents/claims: '082 (cl. 21) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |

MISHCON DE REYA NEW YORK LLP

| No construction necessary | - Sargent - "antenna and circuitry sensing an electromagnetic signal set at 320 MHz" Pursuant to S.P.R. 3.2, Defendants believe that this claim element is governed by 35 U.S.C. § 112(6)1(0. This claim is indefinite at least because the '082 patent fails to disclose structure, material or acts for performing the claimed function. This claim is therefore rendered invalid under at least § 112. To the extent this claim is even capable of construction, Defendants construe it as indicated herein. |
|---|---|
| | - Schlage - Subject to 35 U.S.C. § 112(6/f) **Function:** Sensing an incoming radio frequency signal set at 320 MHz, an optical signal, or an infrared signal **Structure:** This patent fails to disclose structure sufficient to perform the function and is thus invalid under § 112. The only structure disclosed is: R.F. wake-up circuit 61 (shown in FIG. 7), R.F. decode circuit 62 (shown in FIG. 7), and antenna 63 (shown in FIG. 6) *See* '082 Patent at col. 7, lines 40-56; col. 8, lines 1-54; FIGS. 6 & 7 (and relevant description). |

Claim 21 of the '082 patent recites the limitation of a "means for sensing an input signal." OSS originally proffered that no construction of this limitation was necessary. After further consideration, OSS agrees with Sargent and Schlage that this limitation is subject to 35 U.S.C. § 112 ¶6/f. The recited function is "sensing an input signal." Because the input signal is linked to "electromagnetic signal," Defendants appear to contend that the input signal should be limited in the same manner that "electromagnetic signal." For the reasons set forth, supra in Section IV.D, "electromagnetic signal" should not be construed to be so limited and, consequently, neither should "input signal" in the "sensing" function.

Defendants further contend that the '082 patent fails to disclose sufficient structure for performing the recited function rendering the limitation indefinite. OSS disagrees. Sufficient structure for performing the recited function is found in column 8 of the '082 patent from lines 1 to 31. The corresponding structure is:

1)   the RF wake-up circuit 61 (*see* '082 patent, col. 8, lines 2-4, "RF wake-up circuit 61 periodically wakes up from a low power sleep mode and **senses** if there is an incoming RF signal,"); and

2)   the transistors Q1 and Q2, and associated resistors, capacitors, inductors and diodes, of the RF decode circuit 62 (*see* '082 patent, col. 8, lines 16-26, "The RF decode circuitry 62 consists of two bipolar junction transistors Q1, Q2, two operational Amplifiers, OP1 and OP2, and

MISHCON DE REYA NEW YORK LLP

resistors, capacitors, inductors and diodes connected to these components.….. A burst of frequency is **detected**[7] by the Q1 and Q2 transistors with their circuits tuned to the correct frequency (320 MHz in this example). The RF decode circuitry 62 then **senses** the data bitstream sent in the form of digital 1 data signal and digital 0 dead band of no frequency.")

These disclosures are shown schematically in Figure 7, attached to the Petrsoric Decl. as Exhibit 5.  Referencing the figure, the corresponding structure for "means for sensing" is as follows: RF Wake-Up Circuit 61; transistors Q1 - Q2, resistors R1 – R5 & R10 – R12, capacitors C1 – C2 & C5 – C8 & VC, and inductors L1 – L2 of RF Decode Circuit 62.

I.   **"microprocessor is programmed to enter a code programming sequence in response to a pressing of the program key" / "code programming operation"**

| Asserted Patents/claims: '576 (cl. 10); '100 (cl. 30, 88) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| A mode where a memory location is able to be modified | - BRK Brands - "code programming operation": the mode in which a new access code can be programmed into the non-volatile memory<br><br>- Sentry – Programmed instructions stored in memory for execution by the microprocessor that allows an additional access code to be stored in the nonvolatile memory in addition to the previously stored access code, wherein either: 1) the previously stored access code can also be used to access the electronic access control device; or 2) the previously stored access code is temporarily disabled. |

OSS proposes that this term be construed as "a mode where a memory location is able to be modified."  Defendants are again trying to import limitations from certain embodiments that either were disclosed in the specification, or were concocted without any supporting intrinsic evidence.  For example, the '576 patent specification describes at least two ways of storing a new or secondary

---

[7] Sensing, as Sargent's extrinsic evidence shows, is a form of detecting.  Sargent offered two definitions, one of "sensing" and the other of "sensing circuit," both of which define sensing in terms of "detecting".  (*See* D.I. 55, Ex. A at p. 40 (Sensing: "to be or become aware of; to comprehend; understand; to detect automatically, as by sensors."; Sensing Circuit: "A circuit whose function is to detect the occurrence of some event at its input terminals.")(citations omitted).)

MISHCON DE REYA NEW YORK LLP

access code.  The new access code does not only have to be stored in non-volatile memory, which flies in the face of Defendants' proposed construction.  As described in the specification, "the option of disabling the permanent access code temporarily when a new access code is stored in ***RAM 23***."  ('576, col. 8, lines 3-5 (emphasis added)).  As the '576 patent describes, RAM is volatile memory:

> The operator may then input either the access code from the EPROM 22 or the additional access code to open the lock. The operator may repeat this procedure and place additional access codes into RAM 23. ***The additional access codes will be stored in RAM 23 until the power is removed from the microprocessor 14 at which time the RAM 23 memory will be lost***.

> An alternate mode of using the PROG key is to disable the permanent access code in the EPROM 22 temporarily when a new access code is entered into RAM23. After the PROG key is hit, the microprocessor 14 inputs the next five numbers 34, 35, 36, 37 and 38. The comparator 57, within the microprocessor 14, compares the input number with the permanent access code 39 from EPROM 22. If the two numbers match, the microprocessor 14 inputs a second access code 41, 42, 43, 44, 45. In this alternative, when the microprocessor 14 stores in RAM 23 the new access code 46, it disables access to the permanent access code in RAM 23. ***Therefore, until the battery 18 is turned off, the only access code available is the new access code stored in RAM 23.***

> ('576, col. 8, lines 27-52 (emphasis added).)

Further, when looking at the claim language surrounding this term, certain claims do require storage of the access code in non-volatile memory, while others do not:

> • microprocessor is programmed to enter a code programming sequence in response to a pressing of the program key, receive a first input code from the keypad, compare the first input code with the stored access code in the non-volatile memory, receive an additional access code from the keypad if the first input code matches the stored access code, and store the additional access code in the non-volatile memory ('576, claim 10)

> • microprocessor being configured to enter a code programming operation in response to pressing of the program key, receive an

24

MISHCON DE REYA NEW YORK LLP

input key code through the keypad in response to detecting the pressing of the program key, and store the input key code in the memory as the access code for the access control device ('100, claim 30)

Finally, Defendants Sargent and Schlage claim that this term is not present in claims asserted against them.  However, claim 30 of the '100 patent is asserted against Sargent, and claim 88 of the '100 patent is asserted against Schlage. Defendants' constructions for this term would improperly exclude other preferred embodiments otherwise captured by the plain claim language.  *See Vitronics*, 90 F.3d at 1583.  For at least these reasons, OSS' proposed construction of this term should be adopted.

**J.  "portion"**

| Asserted Patents/claims: '725 (cl. 1); '758 (cl. 14) | |
|---|---|
| OSS' Construction | Defendants' Construction |
| No construction necessary | - Sargent – "a part of a larger amount" <br><br> - Schlage - As used in the asserted claims of the '758 patent, "portion" is indefinite under 35 U.S.C. § 112, second paragraph, *e.g.*, "a circuit having a portion . . . during a first time period . . . a portion of the circuit . . . during a second time period . . . a portion of the circuit being . . . for an extended time period that is greater than the second time period . . . a portion of the circuit . . . during the extended time period . . ." the low-battery detection circuit . . . during the first time period and . . . during or after either the second or the extended time period. |

Like "dedicated," the term "portion" is a common word with a well-understood meaning.  The patentee's use of this word does not depart from this plain and ordinary meaning.   Defendants separately take two positions regarding "portion."  First, Sargent proposes that "portion" be construed as "a part of a larger amount."  Nothing in this construction detracts from the plain and ordinary meaning of "portion," and Sargent makes no citation to the intrinsic record.  Thus, there is nothing whatsoever to indicate the patentee departed from the plain and ordinary meaning of "portion."  Second, Schlage's takes the position that "portion" is indefinite under 35 U.S.C. § 112 ¶2.  Schlage faces a high bar to establish that the term "portion" is indefinite.

25

MISHCON DE REYA NEW YORK LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

"[A]ny description which is sufficient to apprise manufacturers in the language of the art of the definite feature of the invention, and to serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent.

4

5

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2128-29 (2014) (quoting *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U. S. 403, 437 (1902).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

As stated above, the term "portion" has a plain and ordinary meaning that would have been well-understood by the average person and most certainly by those of ordinary skill in the art. Defendant Sargent had no trouble providing a definition for this term. The definition provided by Sargent comports with the plain and ordinary meaning of the term, which the patentee did not depart from. Claims 1 of the '725 patent and claim 14 of the '758 patent use the term to describe an access control device or method which includes a circuit and in which "a portion of the circuit" is enabled or the function that "a portion of the circuit" performs. Using the plain and ordinary meaning of "portion," these claims are describing part of the circuit, which would be less than the entire circuit. Thus, the descriptions of what is claimed in these claims are more than sufficient to apprise manufacturers of the definite features of the invention. The claim term "portion" is not indefinite and the patentee's use of the term in the claims did not depart from its plain and ordinary meaning. Schlage's assertion to the contrary should be rejected.

21

### K.   "program key"

22

23

24

25

26

| Asserted Patents/claims: '576 (cl. 10); '615 (cl. 4); '100 (cl. 30, 88); '725 (cl. 2, 8); '758 (cl. 21) | |
|---|---|
| OSS' Construction | Defendants' Construction |
| No construction necessary | - BRK Brands and Schlage - a dedicated button that, without any other key stroke, initiates a code programming operation<br><br>- Sentry - A dedicated button mounted on the keypad that, without any other keystroke, interrupts sleep mode and initiates a code programming operation. |

27

28

A "program key" is just that, a key for programming an access code into an

Mɪsʜᴄᴏɴ ᴅᴇ Rᴇʏᴀ Nᴇᴡ Yᴏʀᴋ LLP

electronic lock.  Defendants proposed three separate and different constructions for this term.  It is OSS' position that the Court need not construe this term because it comports with "the widely accepted meaning of commonly understood words."  *See Phillips*, 415 F.3d at 1312; *Mirror Worlds,* 2010 U.S. Dist. LEXIS 82070 at \*20.  The term "program key" is a commonly term with a commonly understood ordinary meaning.   The patentee has not departed from this meaning, and therefore, the term does not require construction in order to assist the jury in understanding the appropriate scope of the claims.

Rather than clarifying the scope of the claims which use this term, BRK, Sentry and Schlage attempt to unreasonably and inappropriately limit the claim scope by importing limitations from the specification ("dedicated button," "without any other key stroke," "mounted on the keypad," and "interrupt sleep mode").  This should be rejected.  *See, e.g.*, *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

Contradicting the position Sentry is taking, that the "program key" is "mounted on the keypad," the specification clearly identifies the "program key mounted on the keypad" embodiment as exemplary:

> ***For example***, the 12 keypad entries are shown in rows and columns…. The multiplexing of the keypad allows for input of twelve different inputs ("0" through "9", PROG, and CLR) using a four by three configuration, as shown in FIG. 4 and FIG. 5. In particular, there are four rows and three columns in this configuration. In accordance with another embodiment, a keypad with four different inputs allows for as little as a two by two configuration through multiplexing the inputs.

(576, col. 6, line 29-38.)

Persons of ordinary skill in the art would recognize that there are other

MISHCON DE REYA NEW YORK LLP

locations on an electric lock that a program key could be placed.  While the patent shows one such embodiment, nowhere in the specification, or elsewhere in the intrinsic record, does the patentee limit the placement of the program key to any specific location.

Moreover, when the patentee desired to limit claim scope as Defendants suggest, he did so through the express language of the asserted claims:

- "wherein the keypad includes a program key connected to one of the interrupt inputs of the microprocessor, and wherein the microprocessor is programmed to enter a code programming sequence in response to a pressing of the program key" ('576, claim 10)

Contrast this claim with one where the patentee did not make an express limitation in the claim language:

- "a program key wherein the program key is pressed prior to storing the access code in a memory" ('758, claim 21)

Defendants attempt to import limitations from some claims into all claims that use a program key.  For example, claim 10 of the '576 patent requires the program key to be "connected to one of the interrupt inputs of the microprocessor."  Claim 21 of the '758 patent, however, does not have such a requirement.  As identical claim terms in the same patent family must be construed to have the same meaning, Defendants' proposed constructions would render certain terms in the asserted claims superflous. *See In re Rambus*, 694 F.3d at 48; *see* also *Digital-Vending Servs. Int'l, LLC*, 672 F.3d at 1275. Consequently, Defendants' proposed construction creates confusion regarding what is an otherwise easily understood term.  At least for these reasons, no construction is necessary for "program key."

## L.   "sleep mode / operation mode"

| Asserted Patents/claims: '576 (cl. 7, 8, 15); '615 (cl. 1, 2, 9); '100 (cl. 30, 88, 89) | |
|---|---|
| OSS' Construction | Defendants' Construction |

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

| A mode where less power is consumed than in a normal operational mode / A mode in which a microprocessor shifts from a lower-power consuming mode (e.g. "standby," "low power," or "sleep mode,") to allow the microprocessor to activate one or more functions of the electronic access control device | - BRK Brands, Sentry and Schlage – "<u>sleep mode</u>": A mode in which the microprocessor is not functioning "<u>operation mode</u>": A mode in which the microprocessor is functioning<br><br>- Sargent - No construction necessary |
|---|---|

OSS proposes constructions for "sleep mode" and "operation mode" that are consistent with the specifications of the asserted patents and with the extrinsic evidence. Sargent contends that these terms do not require construction. While OSS believes construction would be helpful to a lay jury, it is amenable to agreeing that no construction is necessary. [8] Regardless, the construction proposed by the remaining Defendants is wrong for the same reasons that the proposals for "enabled-disabled" are – the constructions read out the clear description of the preferred embodiment.

As discussed, supra in Section IV.E, the specification discusses two modes for operation of the microprocessor and associated circuitry, one being the "sleep mode" where the microprocessor and associated circuitry are consuming a low amount of power and the other, "normal operation," where more power is being consumed to respond to incoming signals in the form of electromagnetic signals, keypad inputs, etc. to operate the lock (i.e., the "electronic access control device" as it is claimed):

> The accessed device is designed for low power consumption so that it may operate on a battery for an extended period of time. ***The remote access device is normally in a sleep mode. In other words, the device is not in active operation.*** The remote device can "wake-up" from the low power sleep mode in a variety of ways. One method is for the circuitry in the sleep mode device to sense the incoming signal. ***When the signal is sent, the remote device resumes normal operation.*** Another method is for the circuitry in the sleep mode device periodically to resume normal operation

---

[8] Most lay jurors will have familiarity with the low-power consumption connoted by "sleep mode," at least in the context of PC power saving modes. *See, e.g.,* http://dictionary.reference.com/browse/sleep+mode?r=66, "an energy-saving standby condition of a computer which can be reactivated by external stimulus, such as touching the keyboard".

MISHCON DE REYA NEW YORK LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MISHCON DE REYA NEW YORK LLP

and sense if there is an incoming signal. If the incoming signal is sent, the circuitry is able to receive the bitstream data that contains the access code. ***The circuitry thus remains in a low-power sleep-mode condition for the majority of the time, dissipating low power, while no signal is received***.

('576, col. 9, line 58 – col. 10, line 5 (emphasis added).)

The specification further describes the limited activity of the microprocessor in sleep mode:

> Normally***, in sleep mode, pins R1, R2, R3 and R4 [of the microprocessor] are waiting for an input***. When, for example, the keypad "3" is input, pin R1, which keypad "3" is connected to, is triggered signifying to the microprocessor 14 that an interrupt has occurred. The microprocessor 14 then executes an interrupt in the software program and changes one of the four pins (R1, R2, R3 and R4) into an output whereby a logic high is sent to the R1 pin.

('576, col. 6, lines 44-51 (emphasis added).)

As the specification makes clear, in sleep mode the microprocessor is performing at least the limited functionality of waiting for the input pins to indicate a keypad stroke has been effected (*see* '576, col. 9, lines 63-65, "One method is for the circuitry in the sleep mode device to sense the incoming signal.") which will interrupt the software program in execution at that time (*see* '576, col. 6, lines 48-51).  Similarly, the microprocessor can be interrupted by a bitstream received through an electromagnetic signal.  (See *see* '576, col. 11, line 62 – col. 12, line 5.)

The proposed construction from BRK, Sentry and Schlage require that "the microprocessor is not functioning" in sleep mode.  This runs contrary to the intrinsic record and is therefore incorrect.  *C.R. Bard, Inc.*, 388 F.3d at 865 (A claim construction that reads out a preferred embodiment is "rarely correct").

In order to maintain consistent, timely operation of the access control device, the microprocessor must perform at least some limited functionality while it is in sleep mode.  A construction that requires the microprocessor to perform no function while in sleep mode is contradictory and cannot stand.  Furthermore, this

30

assertion is belied by the testimony of Sargent's expert, Dr. Stephen Heppe:

> As would be appreciated by one of ordinary skill in the art at the time of filing, many microprocessors (and other systems) incorporate a low-power mode of operation that can conserve battery power (or reduce power consumption in general, even for a device powered by an external power source, which can promote energy efficiency and reduce the need for cooling). A low-power mode of operation is sometimes called a "sleep mode", although in some cases, *a low-power mode of operation still allows for useful processing (albeit at a lower rate, or with fewer computing resources)*.

(Petrsoric Decl., Ex. 4, Declaration of Dr. Stephen Heppe, ¶72(emphasis added.)

For the foregoing reasons, OSS respectfully asks the Court to adopt its construction for "sleep mode" and "operation mode" or, in the alternative, to follow Sargent's suggestion that no construction is required.

### M.   "solenoid coupled to the lock for opening and closing the lock"

| Asserted Patents/claims: '547 (cl. 18) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| No construction necessary | - Sentry - A solenoid connected, fastened, or joined to the lock for moving the lock between a position that secures a door, gate, lid, drawer, or the like, and a position that unsecures the door, gate, lid, drawer, or the like. |

No construction is required for this phrase as the phrase itself unambiguously defines the structure claimed. Nevertheless, Sentry insists this phrase requires construction. An examination of Sentry's proposed construction suggests that Sentry is attempting to construe multiple terms within the phrase. First, Sentry appears to construe "coupled" to mean "connected, fastened, or joined." Second, Sentry appears to construe "opening and closing the lock" to mean "moving the lock between a position that secures a door, gate, lid, drawer, or the like, and a position that unsecures the door, gate, lid, drawer, or the like." Neither of these constructions finds any supports in the intrinsic record, nor are they supported by any extrinsic evidence cited by Sentry.

31

First, the word "coupled" is a common term in the context of discussing any mechanical device. The purpose of using the term "coupled" is to describe two components that together achieve a combined effect. However, the term "coupled" alone does not specify the mechanics with which the two components are combined. OSS does not dispute that the claimed solenoid and lock do not exist in isolation and indeed must interface in some manner. However, it is unclear, what, if any, clarity is provided by Sentry's proffered construction.[9] Sentry's construction is broad enough to capture nearly all forms of one component interfacing with another. Indeed, the term "connected" alone, which Sentry uses, is very broad in itself. The claim construction process "is not an obligatory exercise in redundancy." *O2 Micro Int'l Ltd.*, 521 F.3d at 1362. The Court should not construe this limitation simply because Sentry has submitted it for construction.

Not only is Sentry's construction of coupled not helpful to a jury, it arguably broadens the scope of the claim. As described above, two components coupled together achieve some combined effect. Sentry's construction potentially discards this important aspect of the term coupled, focusing only on the mechanism in which the two combined. Thus, Sentry's definition may not only be of no help to a jury but may actually confuse a jury. Construing "coupled" as Sentry suggests would confuse the bounds of the scope of the claims, potentially and improperly narrowing it in one regard and broadening it in another.

The remainder of Sentry's proposed construction appears to be directed to the latter part of this term, "opening and closing the lock." However, Sentry's proposed construction does not actually construe or interpret this term, but merely adds a limitation describing what it is the lock is securing. Specifically, Sentry

---

[9] Although it is not clear from Sentry's choice of words, it is possible Sentry is attempting to construe "coupled" to mean physically bound or in direct contact. However, Sentry has identified no evidence that would support such a construction.

MISHCON DE REYA NEW YORK LLP

proposes that the lock must secure (and unsecure) "a door, gate, lid, drawer, or the like." Nowhere in the record is there anything to indicate the patentee intended to limit this term in such a manner. Indeed, nowhere in the intrinsic record, and most certainly nowhere in the claims, is this limitation ever even mentioned. "Where the function is not recited in the claim itself by the patentee, we do not import such a limitation." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001). Sentry has manufactured this construction from whole cloth. It adds ambiguity rather than clarifying. Initially, Sentry selects four items it wishes to limit the application of this claim to, a door, a gate, a lid, and a drawer. Then, Sentry adds "the like," clearly extending the bounds of the construction beyond the initial four items. However, Sentry's construction provides nothing to indicate what the bounds of this extension are. Thus, not only would Sentry's construction improperly limit the scope of this term, but it would obscure where the outer bounds of that limited scope lie.

Neither portion of Sentry's proposed construction finds any support in the intrinsic record. In the parties' joint submission of proposed constructions to the Court, Sentry cited to numerous parts of the patent's specification.[10] Each of these sections of the specification discusses a solenoid, and almost all citations describe a solenoid that is used to open a lock. However, none the citations sections say anything about fastening the "coupled" components together or describe what the lock should be securing. It is unclear how any of these citations provide any support Sentry's citations. Sentry's proposed construction should be rejected and this term's plain and ordinary meaning should be adopted.

---

[10] Sentry also cites to extrinsic evidence, specifically a page in a dictionary. However, Sentry failed to provide the definition or even state which word it was referring to. OSS is unable to examine Sentry's evidence without this information.

33

MISHCON DE REYA NEW YORK LLP

## N.    "wake-up signal"

| Asserted Patents/claims: '576 (cl. 15); '615 (cl. 1, 9) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| An indicator that enables circuitry to receive information | - BRK Brands - An interrupt that causes the microprocessor to enter an operation mode, *i.e.*, begin functioning<br>- Sentry - An electrical impulse that causes a microprocessor to enter a mode where current is flowing therethrough.<br>- Sargent - a signal generated external to a microprocessor and separate from the keypad's transmission of the access code numbers, which causes the microprocessors to switch from a sleep mode to an awake mode of operation<br><br>- Schlage - an interrupt that causes the microprocessor to begin drawing current |

OSS proposes that "wake-up signal" should be construed as "an indicator that enables circuitry to receive information". In other words, the wake-up signal does precisely what it sounds like it does, it wakes up a device. In the context of the asserted claim language, a wake-up signal is generally provided or generated in response to pressing a key on a keypad. As disclosed in the specification, this signal may be in the form of a microprocessor interrupt signal. ('576, Fig. 3, elements R1-R4.) However, the specification does not require this to be the only form of a wake-up signal.

Sargent's proposed construction reads out the preferred embodiment by requiring that a signal is "generated external to a microprocessor ***and separate from the keypad's transmission of the access code numbers***." As is clearly shown in Fig.3 of the '576 patent and its related description, the input/outputs R1-R4 of the microprocessor are connected to the keypad to initiate receipt of the keypad's transmission of access codes:

***Normally, in sleep mode, pins R1, R2, R3 and R4 are waiting for an input. When, for example, the keypad "3" is input, pin R1, which keypad "3" is connected to, is triggered signifying to the microprocessor 14 that an interrupt has occurred.*** The microprocessor 14 then executes an interrupt in the software program and changes one of the four pins (R1, R2, R3 and R4) into an output whereby a logic high is sent to the R1 pin. When a keypad is pressed, it acts as a short circuit; thus, when the

34

microprocessor 14 sends out a logic high, it then senses pins C1, C2 and C3 to determine exactly which keypad in the row has been pressed.

('576, col. 6, lines 44-55)

Sargent's proposal is not only unsupported by the intrinsic record, but runs contrary to the specification.  "Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support[.]" *Vitronics*, 90 F.3d at 1583.  Additionally, there is no basis in the intrinsic record for Schlage and BRK's proposed limitation that the wake-up signal must take the form of an interrupt signal.  OSS' proposed construction does not import limitations from the specification and does not read out other the preferred embodiments of the inventions.  It captures the scope of what a person of ordinary skill in the art would understand wake-up signal to be and therefore, should be adopted.

### O.    "wherein a memory contains a limit value/limit value"

| Asserted Patents/claims: '100 (cl. 36) | |
|---|---|
| **OSS' Construction** | **Defendants' Construction** |
| Wherein a memory contains a value for limiting access to a device | - Sentry - Number of permitted accesses.<br>- Schlage - The patent claim(s) that contain this term are not asserted against Schlage. |

Upon further consideration, OSS agrees with Sentry's proposed construction of "number of permitted accesses" for the term "limit value."

Dated:  February 3, 2015

Respectfully submitted,

MISHCON DE REYA NEW YORK LLP

By:   */s/* John F. Petrsoric
John F. Petrsoric

NEWPORT TRIAL GROUP
Tyler J. Woods

Attorneys for Plaintiff
O.S. SECURITY LLC

35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MISHCON DE REYA NEW YORK LLP

### **CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2015, the foregoing document was filed electronically via the Court's Electronic Case Filing System (ECF).  Notice of the filing is being served upon all counsel of record automatically through Notice of Electronic Filing.

*/s/ John F. Petrsoric*
John F. Petrsoric

36